46 P.3d 1092

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Carlson YAMAMOTO, Jr.,
Defendant–Appellant.**

No. 23517.

Intermediate Court of Appeals of Hawai'i.

March 13, 2002.

Certiorari Granted April 22, 2002.

David F. Klein, on the briefs, Honolulu, for defendant-appellant.

Loren J. Thomas, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE, and LIM, JJ.

Opinion of the Court by Lim, J.

Defendant–Appellant Carlson S. Yamamoto, Jr. (Yamamoto) appeals the June 7, 2000 judgment of the circuit court of the first circuit that convicted him of kidnapping and terroristic threatening in the first degree. The kidnapping charge accused Yamamoto of intentionally or knowingly restraining the complaining witness, with intent to terrorize her. Because the court committed prejudicial error in instructing the jury that, "Terrorize means the risk of causing another person serious alarm for his or her personal safety[,]" we vacate Yamamoto's kidnapping conviction and sentence and remand that charge for a new trial. We affirm Yamamoto's conviction and sentence for terroristic threatening in the first degree.

## I.

On October 31, 1997, the State filed the following complaint:

COUNT I: On or about the 24th day of October, 1997, in the City and County of Honolulu, State of Hawai'i, CARLSON YAMAMOTO JR. did intentionally or knowingly restrain Lisa Ebata, with intent to terrorize her, thereby committing the offense of Kidnapping in violation of Section 707–720(1)(e) of the Hawai'i Revised Statutes.[1]

COUNT II: On or about the 24th day of October, 1997, in the City and County of Honolulu, State of Hawai'i, CARLSON YAMAMOTO JR. threatened, by word or conduct to cause bodily injury to Lisa Ebata, with the use of a dangerous instrument, to wit a knife in reckless disregard of the risk of terrorizing said Lisa Ebata, thereby committing the offense of Terroristic Threatening in the First Degree in viola-

1. Hawai'i Revised Statutes (HRS) § 707–720(1)(e) (1993) provides that "[a] person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to: .... Terrorize that person or a third person[.]" HRS § 707–700 (1993) provides, in pertinent part, that, " 'Restrain' means to restrict a person's movement in such a manner as to interfere substantially with the person's liberty: ... By means of force, threat, or decep-

tion[.]" HRS § 707–720(2) (1993) provides that "[e]xcept as provided in subsection (3), kidnapping is a class A felony." HRS § 707–720(3) (1993) provides that "[i]n a prosecution for kidnapping it is a defense which reduces the offense to a class B felony that the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial."

tion of Section 707–716(1)(d) of the Hawai'i Revised Statutes.[2]

*COUNT III:* On or about the 24th day of October, 1997, in the City and County of Honolulu, State of Hawai'i, CARLSON YAMAMOTO JR. threatened, by word or conduct to cause bodily injury to Nelson Hamilton, with the use of a dangerous instrument, to wit a knife in reckless disregard of the risk of terrorizing said Nelson Hamilton, thereby committing the offense of Terroristic Threatening in the First Degree in violation of Section 707–716(1)(d) of the Hawai'i Revised Statutes.

(Footnotes added.)

Yamamoto's jury trial commenced on June 3, 1999. Lisa Ebata (Ebata) testified that Yamamoto had been her boyfriend for four-and-a-half years. They had a son from that relationship. Their union ended in or around August 1997. After the split, their son stayed with Ebata. They did not work out any kind of visitation arrangement, but Ebata maintained that she did not prevent Yamamoto from seeing his son.

Ebata related that on October 24, 1997, at around 8:00 a.m., she drove her son, then two-and-a-half years old, to his babysitter's house in Hawai'i Kai. As she pulled into the driveway of the house, she noticed Yamamoto pull his car up behind hers. Ebata allowed Yamamoto to visit with his son for a minute or so. Yamamoto "gave [the boy] a hug, told him to be a good boy." His demeanor at that time appeared normal. Ebata then took the toddler in to the babysitter. Ebata came out of the house after a couple of minutes and, without approaching him, told Yamamoto, in her words, "that I could not talk at that time and that I would call him." She was on her way to school. Yamamoto repeatedly expressed his desire to talk to her then and there, but Ebata each time responded that she could not and would call him later.

Ebata testified that as she was getting into her car, Yamamoto grabbed her around her waist. At the same time, Yamamoto pulled a knife out of his jacket and held it to her stomach. Ebata recognized the knife as one of Yamamoto's kitchen knives. Ebata demanded that he release her. Yamamoto demurred, insisting that she would "listen to him this one time, hear what he had to say." Ebata was shocked at the turn of events and tried to break free, but could not. She feared for her life. Yamamoto dragged her to his car, put her in through the passenger door, followed her in, closed the door and drove off. Throughout, he was holding the knife pointed towards her.

According to Ebata, Yamamoto told her, as he drove, "that I would listen to him to what he had to say and he threatened that if I didn't that he had someone outside of my house watching my family and that if I didn't cooperate that he would give word to whomever and hurt my family." And, "that he had a gun with him and that if he were to hurt anyone, it would be the two of us." Further, "[h]e did mention a rope, but as to what he was going to do with it, I was not sure." Yamamoto told her he was doing what he was doing "because I wouldn't listen to him, I didn't give him a chance to explain himself. . . . He said that he didn't care any more and that he was going to go to jail anyway." Ebata was "[a]fraid and scared." She had been crying from the moment Yamamoto first grabbed her.

Yamamoto drove to his apartment building, about a five-minute drive, and parked in his parking stall. He pulled Ebata out of the car. When she refused to go with him, he pulled out the knife, pointed it at her stomach and dragged her through the parking lot towards his apartment. Ebata kept resisting and telling Yamamoto to let her go. As Yamamoto dragged Ebata down the stairs from the parking structure, a man walked by and noticed the commotion, whereupon

**2.** HRS § 707–716(1)(d) (1993) provides that "[a] person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening: . . . With the use of a dangerous instrument." HRS § 707–716(2) (1993) provides that "[t]erroristic threatening in the first degree is a class C felony." HRS § 707– 715(1) (1993) provides that "[a] person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony: . . . With the intent to terrorize, or in reckless disregard of the risk or terrorizing, another person[.]"

Yamamoto put the knife back in his pocket. Ebata took the opportunity to break free. She ran to the guard house at the entrance to the driveway of the apartment building.

Inside the guard house, Ebata told the security guard there that she needed help and that he should call the police. She explained that her ex-boyfriend was chasing her and that he had a knife. By then, Yamamoto had caught up with Ebata. Ebata told the security guard to keep Yamamoto away from her and to summon help. Standing outside the open door to the guard house, Yamamoto tried to tell the security guard not to listen to Ebata because she was crazy and did not know what she was saying. At about this point, a second security guard arrived outside the guard house. The second security guard told Yamamoto to go to his apartment to calm down. But Yamamoto did not leave. He instead told the security guards to go and get his grandfather, who was upstairs in the apartment.

Ebata recounted that, as the security guard inside the guard house picked up the phone to call the police, Yamamoto "stepped into the guard house, pushed his body against mine and pulled the knife out." The second security guard followed and tried to get Yamamoto to put the knife away. But Yamamoto placed the tip of his knife at Ebata's throat, touching the skin. By the time Ebata was able to push Yamamoto's hand and the knife some distance away from her throat, two police officers had arrived. The police officers drew their guns and told Yamamoto to drop the knife. A second and then a third police command were necessary before Yamamoto complied. He was handcuffed by the police.

On cross-examination, Ebata admitted that in August 1997, Yamamoto told her that an attorney he had hired at one time, Glenn Kobayashi (Kobayashi), "had done him wrong in several ways[,]" and had threatened him. In the next day or two after this revelation, she had a meeting with Kobayashi, her parents and another couple, at which Yamamoto was discussed. Three days after Yamamoto had told her about the threat, she called him and ended their relationship. Ebata admitted that she did not talk to Yamamoto after that except to put him off in those instances in which he was able to speak to her. She was living with her family at the time and had told them that she did not want to talk to him. She refused to take his calls at work. She did not respond to the numerous gifts of flowers and balloons he sent her, or to the cards and letters saying that he was bereft and heartbroken and that he loved her and just wanted her and his son back in his life. Ebata recalled that Yamamoto's telephone calls to her home and workplace were constant, sometimes "every couple minutes[,]" and that she "could not handle" the stress thereby engendered. Ebata filed a "custody suit" against Yamamoto for "full custody" of their son. She never initiated discussions with him about visits with the boy because she was afraid Yamamoto would abscond with him, but she did allow him one visit before the October 24 incident. At the time of the incident, she was "seeing someone else." In mid-October 1997, Ebata received a letter from Yamamoto in which he expressed his love and best wishes for her and their son, begged her forgiveness and said goodbye.

Kevin Hamilton (Kevin), the first security guard Ebata appealed to for help during the incident, testified after Ebata and essentially corroborated her testimony about the events at the guard shack. Kevin also recalled that "[Yamamoto] came down to the guard shack wanting her to go with him back up to the apartment because he wanted to talk to her and she didn't want to go." At that point, Yamamoto was "a little agitated, but he seemed fine." But when Yamamoto pulled the knife on Ebata in the guard shack, "he was upset and he was shaking." He was also saying "something about how she's been messing with him for a couple of years and things about their son." Kevin admitted on cross-examination that, following the incident, he had never been told by the second security guard, his brother Nelson Hamilton (Nelson), that Nelson had been threatened by Yamamoto.

Nelson testified next. He, too, generally corroborated Ebata's account of what happened at the guard shack. But in addition, Nelson remembered that when he ap-

proached Yamamoto and told Yamamoto several times to leave the guard shack, Yamamoto pulled a kitchen knife, pointed it at him and demanded that he leave the guard shack. Nelson "was a little bit scared" and "[f]elt threatened." Yamamoto then proceeded to turn the knife on Ebata. As he held the knife to her throat, then to her chest and then to her stomach, and back up again, Yamamoto complained that he "hadn't seen the child for some time." He also said "that something about his business was failing."

Jim Yasue (Yasue), one of the two police officers who responded to Kevin's call for assistance, also essentially confirmed Ebata's recall of what transpired at the guard shack. Yasue maintained that when Yamamoto was directed to drop the knife, "[h]e stated something to the effect that, See what you are doing, you are making me do this[.]" Yasue recovered the knife that Yamamoto relinquished, as well as a rope, in its original packaging, from one of Yamamoto's shorts pockets. The other police officer, Nathan Baysa (Baysa), also gave consistent testimony about the events at the guard shack. Baysa recalled hearing Yamamoto say in a loud voice, as Yamamoto was holding Ebata under the knife, "tell him, tell him why I'm doing this." Baysa added, "And I think he also said something to the effect where she no let me see my son, something."

After Baysa's testimony, the State rested. Yamamoto tendered a motion for judgment of acquittal, "based upon the failure of the evidence to reflect, number one, an intent to terrorize, number two, that there was ever a threat made against [Nelson]." The court denied the motion.

In his defense, Yamamoto first called his maternal grandmother, Dorothy Lee (Lee). She testified that after Yamamoto's relationship with Ebata ended, he was "very upset about the situation, not being able to see [Ebata] or his son, and he seemed depressed." Lee also mentioned that Yamamoto was under "pressure or stress" due the role Kobayashi had played in the breakup. Lee remembered that Yamamoto was having business problems before the October 24 incident.

Yamamoto testified next. He related that he owned a small business, an auto detailing company. In June 1997, he was looking to expand his business. People had told him that he needed an attorney for that, so he engaged Kobayashi, who had been referred by one of Yamamoto's employees. There came a time, in July 1997, when Yamamoto could not make his payroll. The employees banded together in protest, which apparently garnered some negative television coverage. Yamamoto alleged that, at Kobayashi's urging, he gave Kobayashi money to make the payroll, but Kobayashi never applied the money as intended and Yamamoto never saw that money again. The night of the television exposure, Ebata called Yamamoto and broke up with him. As a result of the breakup, Yamamoto suffered a number of physical problems and had to be hospitalized: "I—I—I just couldn't live without my family." However, a week and a half later, Kobayashi arranged a meeting for Yamamoto with Ebata and her parents. There, Kobayashi apparently placed the blame for the money troubles upon the employee who had referred Kobayashi to Yamamoto, and assured Yamamoto that there was money to meet the payroll. Kobayashi also "tried to help to mend the so-called relationship together." Out of that meeting came a reconciliation between Yamamoto and Ebata.

Yamamoto remembered that he was in such a state of bliss over the return of Ebata and their son that he acceded to Kobayashi's suggestion that Kobayashi's friends be brought in to run the business and sell it for Yamamoto. As a result, Yamamoto started spending most of his time with Ebata and their son. However, in August 1997, Yamamoto received a call from the State attorney general's office that his employees were not being paid. He also discovered "a whole stack" of customer complaints in the business office. Yamamoto called Kobayashi for an explanation and was told not to worry about it. Yamamoto persisted, however, and after a meeting with Kobayashi in late August 1997, phoned Kobayashi and told him that he wanted all of his money back. Kobayashi responded with profanity and threats. Yamamoto recalled, "He told me, do you know who the F I am? You know. Do you

know who the F I am?" Yamamoto said that the threats were "about hurting my family, about raping [Ebata], and about killing my son, and killing her and killing me." Yamamoto felt afraid and threatened. He told Ebata about the threats and to be careful. He sought help from another attorney, Steven Geshell (Geshell). He called the police and made a police report.

Ebata did not contact Yamamoto for three days after he informed her of the threat. However, on the third day, Ebata called Yamamoto and told him, "I don't think this is going to work out[,]" and then hung up. Asked about how he felt at that moment, Yamamoto responded: "I—couldn't believe it. I—I couldn't believe that—that—that my—my business was falling apart. I couldn't—I couldn't believe—I couldn't believe that I—I'm getting threat to—my family's getting threatened, and I lost my son and [Ebata] again. I couldn't believe it." In order to find out what had happened, Yamamoto had Geshell investigate. For his part, Yamamoto mounted a frenetic campaign of telephone calls and letters to Ebata, spiced with bouquets of flowers, with no response and all to no avail. He even resorted to parading another woman through Ebata's workplace, in a futile attempt to provoke some response from her. "I just—I just wanted—I just wanted to understand. I—I just wanted to understand. Nobody explained to me nothing."

Meanwhile, Yamamoto's business, apparently still under Kobayashi's control, continued its downward spiral. Also during that time, Kobayashi allegedly threatened Yamamoto yet again. Kobayashi told Yamamoto that if Yamamoto would give him certain exorbitant gifts, he could get Ebata to reconcile with Yamamoto. Kobayashi added that if Yamamoto did not cooperate, he would hurt Yamamoto, Ebata and their son. Yamamoto immediately contacted Geshell. Geshell went over to Yamamoto's apartment and the police were called. A police report was made, but no official action was taken. Yamamoto also testified that he called the FBI and the Office of Disciplinary Counsel. Yamamoto maintained that his apprehension was justified because Kobayashi was some-

how privy to personal information about Ebata that "nobody knew about." Also, people were saying that Kobayashi had the ability to carry out his threats. And Yamamoto had heard that Kobayashi had been taking Ebata around to "different meetings[.]" At about the time all of this was happening, Ebata filed her paternity action, asking for "full custody," child support and supervised visitation. All of this, Yamamoto claimed, was on his mind on October 24, 1997.

Yamamoto admitted that on October 24, 1997, he brought a knife and a rope with him. He took the knife because "I wanted to talk to [Ebata] and I couldn't. And I, um—I—I wanted—I wanted—I wanted her to know the truth. I wanted her to know how much I love her." He took the rope because "I didn't want anyone to—to stop—to stop me from, um—from killing myself and the truth coming out. And I was gonna—I was gonna tie the door in my apartment so that, um, I could—I could save my family, and if not I could just die."

Yamamoto's account of what happened at the babysitter's house that day essentially paralleled Ebata's, with the following significant divergences. Yamamoto admitted taking Ebata into his grasp near his car, but maintained that the knife was pointed towards himself. He had earlier implored Ebata to talk to him and in doing so had said, "I'm gonna kill myself, you know." Yamamoto told Ebata that he wanted them to go back to his apartment because "I wanted to show her all the proof that I had about [Kobayashi] and I wanted her to see the truth." Ebata kept telling him to put the knife away, but Yamamoto maintained that she never said anything else. Yamamoto remembered that Ebata got into his car, but when asked whether he waved the knife at her to get her in the car, responded, "I don't remember that part." Yamamoto claimed a similar lack of memory of succeeding events, up until he was driving with Ebata past a fire station. At that time, he had the knife in his right hand but was not pointing it at anyone in particular: "It was pointing in all directions . . . . I talk with my hands, you know." During the drive, Yamamoto finally acceded to Ebata's repeated requests, and

put the knife in his pocket. Yamamoto made no mention of the threats he allegedly made to Ebata during the drive to his apartment building.

Yamamoto's testimony about events at the apartment complex also mirrored Ebata's, but again with some significant differences. Yamamoto testified that after he parked his car at the apartment complex, he and Ebata talked for awhile. The next thing he remembered was being in the guard shack. He told Ebata, "you gotta talk to me[,]" but she refused. He remembered hearing the security guards talking and he remembered telling them that Ebata was crazy, but he professed not to care at that time whether the security guards stayed or left. He remembered that at some point "the knife came out[,]" but he could not remember his state of mind at that point. He acknowledged telling the security guards to leave at that point, but claimed that he wanted them to call the police, "[b]ecause I wanted the police and everybody to know what—what was going on." Yamamoto made no mention of restraining Ebata, but he admitted that the knife was pointed "towards her throat and then it went down and up and down and up." He explained, however, that, "I—I talk with my hands. That's how I talk." He claimed that he did not want to hurt Ebata, that he "just wanted the truth." Failing that, "I just wanted to die." Yamamoto said that Ebata was holding onto his knife hand, but not to force it away from her. He acknowledged that she told him to put the knife down. The direct examination of Yamamoto ended with this exchange:

Q. Did you ever intend to terrorize [Ebata]?

A. No. I did not.

On cross-examination, Yamamoto admitted that Kobayashi confronted him about the police report he had made about the threat, and that he first denied making the report, then told Kobayashi that it was all a misunderstanding. But he claimed he said that only because he was afraid Kobayashi would hurt "my family" if he admitted making the report in earnest. The State took Yamamoto over the various letters, phone calls and other contacts he had with Ebata and her parents

in the months before the incident. He could not specify any in which he had warned Ebata or her family of the threat Kobayashi posed. Excerpts from a number of letters Yamamoto wrote to Ebata were read, all of which were apologies tinged with the resolve to change. In one, Yamamoto lamented "how bad of a boyfriend and father I've been[,]" and begged her forgiveness. In another, Yamamoto resolved, "I would like to set some things straight, though people feel that I've screwed over your family and other people." The State queried, rhetorically, "So was there any question in your mind why [Ebata] had broken up with you?" The State then led Yamamoto through a long impeachment about the events of October 24, 1997. In the main, but not without claiming numerous lacunae in his memory, Yamamoto stuck with the testimony he had given on direct examination.

Redirect and re-cross examination revealed that in August 1998, Yamamoto filed a lawsuit against Kobayashi, "to get back my money." Yamamoto further informed the jury that Kobayashi had defaulted and filed for bankruptcy. Yamamoto also mentioned that Kobayashi "was forced to resign [from the practice of law] August of 1998, finally one year after." Yamamoto admitted that his lawsuit sought relief in the inordinate amount of $305,000, and there was mention that he was owed in excess of $1 million, but he denied that he filed the lawsuit in order to get out of trouble with his creditors.

Yamamoto rounded out his defense with the testimony of Geshell. Geshell remembered that a "very upset" and perspiring Yamamoto called him to the apartment on the night of August 30, 1997. Though reluctant to answer questions about what he had discussed with his client that night, Geshell did reveal that Yamamoto was prevented from leaving to meet Kobayashi that night. Instead, a police officer was summoned to the apartment. Geshell recalled that the police officer left a report form for Yamamoto, but admitted that he could not say whether Yamamoto completed it. After reading a stipulation that Yamamoto had "made [an August 30, 1997] police report [at his apartment] that [Kobayashi] had threat-

ened Yamamoto and his family[,]" the defense rested and evidence was closed.

After the close of evidence, Yamamoto renewed his motion for judgment of acquittal, based upon his assertions "that the State has failed to prove intent to terrorize and that there is insufficient evidence to show terroristic threatening as to Nelson Hamilton." The court again denied the motion.

During closing arguments, the State sought to counter Yamamoto's defense that he did not intend to terrorize Ebata, but rather to talk to her in order to explain, and to get an explanation for, all that had transpired in the several months before the incident:

> Now, [Yamamoto] wanted to talk to [Ebata]. That's true. He wanted her to listen. That's true. Him wanting those things shows us what his motive was for doing this particular act, why he was doing that particular act.
>
> But how, how he was accomplishing the act was by terrorizing her with this knife. So long as he would keep her from escaping, keep her there, where he could control her movements, so long as he could do that, he could talk, he could make her listen.
>
> She wasn't there because she chose to. She was there because she didn't want to get stuck with this knife. She did not want to be harmed or killed.
>
> When he restrained her, he restrained her with the intent to terrorize her, place her in fear for her life and her safety so that he could talk to her or make her listen.

Yamamoto's counsel argued the point as follows:

> This was a—that was basically a period where [Yamamoto's] state of mind grew, over the weeks, that built up to October 24th, 1997. His depression grew. His inability to function as a human being got worse and worse. In his work, in his relationships, he couldn't do anything. And as that happened he could see no way

out but to take his own life if he had to, 'cause he couldn't stand how it was going.

> He wanted to say goodbye to his son. He wanted an answer from [Ebata] so he could die knowing those things. Because who knows what you know when you die or what you take with you when you die. He wanted those things. He did not want to terrorize [Ebata].
>
> Was he foolish?
>
> Was he mistaken?
>
> Yes. He clearly did scare [Ebata]. Any person in their normal right mind would be scared.
>
> But did he intend it?
>
> The answer is no. Therefore, it's not kidnapping. It's unlawful restraint. He intended to restrain her. He intended it under those circumstances. And he intended that she would be restrained so she would listen to him. But he did not intend to terrorize her.

With respect to the charge of kidnapping, the court instructed the jury, in pertinent part, as follows:

> In Count 1 of the complaint the defendant is charged with the offense of Kidnapping.
>
> A person commits the offense of Kidnapping if the person intentionally or knowingly restrains another person with intent to terrorize that person or a third person.
>
> There are two material elements to this offense, each of which the prosecution must prove beyond a reasonable doubt. These elements are:
>
> 1. That on or about the 24th day of October, 1997, in the City and County of Honolulu, the defendant intentionally or knowingly restrained Lisa Ebata;
>
> 2. Defendant did so with the intent to terrorize that person or third person.
>
> Restrain means to restrict a person's movement in such a manner as to interfere substantially with his or her liberty by means of force, threat, or deception.
>
> *Terrorize means the risk of causing another person serious alarm for his or her personal safety.*[3]

---

**3.** This paragraph was submitted to the court as State's Instruction No. 3. The court gave it to

the jury over Yamamoto's objection: "We would object in that this definition is from case law, but

In a prosecution for Kidnapping it is a defense which reduces the offense that the defendant voluntarily released the victim alive and not suffering from serious or substantial bodily injury in a safe place prior to trial.

(Footnote and emphasis added.) The court also instructed the jury on the included offense of unlawful imprisonment in the second degree: [4]

Yamamoto had tendered Defendant's Proposed Instruction No. 1:

It is a defense to the offenses charged that the defendant's conduct was legally justified. The law recognizes the "choice of evils" defense, also referred to as the "necessity" defense.[5]

The "choice of evils" defense justifies the defendant's conduct if the defendant reasonably believed that his conduct was necessary to avoid an imminent harm or evil to himself or another and the harm sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged.

The burden is upon the prosecution to prove beyond a reasonable doubt that:

1) Carlson Yamamoto, Jr. did not reasonably believe that his conduct was necessary in order to avoid an imminent harm or evil to himself or another; or

2) the harm sought to be prevented by the law defining the offense charged

is greater than the harm or evil sought to be avoided by the Defendant's conduct.

Accordingly, if the prosecution has not proved either of the above requirements beyond a reasonable doubt, then you must find Carlson Yamamoto, Jr. not guilty of Kidnapping. If the prosecution has done so, then you must find that the "choice of evils" defense does not apply.

(Footnote added.) During settlement of jury instructions, this proposed instruction was "refused over objection by the defense." Yamamoto's counsel placed her objection on the record, thus:

Your Honor, Instruction No. 1 is our choice of evils instruction. It is one of two defenses that [Yamamoto] is relying upon. It is a—an argument by [Yamamoto] that he reasonably believed his conduct was necessary to avoid an imminent harm, that is the risk of death that was being threatened by [Kobayashi] to his son and to [Ebata] and to himself and that the harm sought to be prevented by the law defining the offense is—is less serious than what was—what would happen if he did not have his conduct, that is the—their death is more serious than her restraint, even if she's terrorized.

The State responded:

Your Honor, my concern is although the burden is very slight there'd just be a scintilla of evidence to support the instruction. It appears from the record there is

---

it is not statutory, and it is a common everyday thing that the jury can define for themselves."

4. HRS § 707–722 (1993) provides, in relevant part, that "[a] person commits the offense of unlawful imprisonment in the second degree if the person knowingly restrains another person.... Unlawful imprisonment in the second degree is a misdemeanor."

5. HRS § 703–301(1) (1993) provides that "[i]n any prosecution for an offense, justification, as defined in sections 703–302 through 703–309, is a defense." HRS §§ 703–302(1) & (2) (1993) provide:

(1) Conduct which the actor believes to be necessary to avoid an imminent harm or evil to the actor or to another is justifiable provided that:
(a) The harm or evil sought to be avoided by such conduct is greater than that sought to

be prevented by the law defining the offense charged; and
(b) Neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and
(c) A legislative purpose to exclude the justification claimed does not otherwise plainly appear.

(2) When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for the actor's conduct, the justification afforded by this section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability.

HRS § 703–300 (1993) provides, in pertinent part, that, "'Believes' means reasonably believes."

not even a scintilla of support there. There is no evidence of immediacy or harm.

There is an alleged threat of August 30th, 1997, some two months prior to the incidence [(sic)]. As well, the harm sought to be prevented, allegedly [Yamamoto] wished to advise of a threat, a threat of harm, he wished to warn [Ebata] of some threat.

The harm he inflicted was a completed offense, was an actual, physical, completed offense of kidnapping and terroristic threatening. By no stretch of the imagination could that be called a lesser evil. So it just doesn't appear that this instruction's appropriate in this case.

The court concluded: "Since there's not any evidence to support the giving of this instruction, the Court is refusing."

It took the jury sixty-two minutes to return verdicts of guilty of kidnapping and guilty of one count of terroristic threatening in the first degree (of Ebata). With respect to its kidnapping verdict, the jury found that the State had proved beyond a reasonable doubt that Yamamoto did not voluntarily release Ebata, thereby enabling the court to convict him of kidnapping as a class A felony. The jury found Yamamoto not guilty of the other count of terroristic threatening in the first degree (of Nelson), and the court entered a judgment of acquittal as to that count. On June 7, 2000, the court entered its judgment, convicting Yamamoto of kidnapping and terroristic threatening in the first degree, and sentencing him to a twenty-year indeterminate term of imprisonment on the former conviction and a five-year indeterminate term of imprisonment on the latter conviction, the terms to run concurrently. On June 13, 2000, Yamamoto noticed this timely appeal.

## II.

Yamamoto presents three issues on appeal. First, Yamamoto contends the court[6] erred when it instructed the jury, in connection with the kidnapping charge, that, "Terrorize means the risk of causing another person

serious alarm for his or her personal safety." Second, Yamamoto asserts there was insufficient evidence to support the jury's finding that he did not release Ebata voluntarily. Third, Yamamoto argues that the court erred in not giving his proffered jury instruction on the choice of evils defense.

## III.

■ It is well-settled that "[w]hen jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *State v. Kelekolio*, 74 Haw. 479, 514–515, 849 P.2d 58, 74 (1993) (citation omitted).

■ Hawai'i Revised Statutes (HRS) § 707-720(1)(e) (1993) provides that "[a] person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:.... Terrorize that person or a third person[.]" The court correctly instructed the jury as to the *mens rea* of the offense: "Defendant did so with the intent to terrorize that person or third person." However, the court also instructed the jury that, "Terrorize means the *risk* of causing another person serious alarm for his or her personal safety." (Emphasis added.) This was error. The latter instruction has no basis in our criminal statutes, and by implying that a person is guilty of kidnapping if he or she intends the mere risk of causing another person serious alarm for his or her personal safety, derogates the culpable state of mind, required for conviction by HRS § 707-720(1)(e). *See* HRS § 701-102(1) (1993) ("No behavior constitutes an offense unless it is a crime or violation under this Code or another statute of this State."). *See also* Commentary on § 701-102 ("There are no common-law offenses in Hawai'i[.].... That all offenses should be adequately proscribed by statute seems at this point of legal development a dictate of fundamental fairness.").

In proffering the erroneous instruction below, the State cited *In re Doe*, 3 Haw.App.

---

**6.** The Honorable Sandra A. Simms, judge presiding.

325, 650 P.2d 603 (1982), which defined "terrorize" as "conduct causing serious alarm for personal safety," *id.* at 331, 650 P.2d at 608 (italics, citation and internal block quote format omitted), and which identified "the precise issue [as] whether the record contains sufficient evidence of juvenile-appellant's intent to cause or of his reckless disregard of the risk of causing Child 1 serious alarm for his personal safety." *Id.* at 332, 650 P.2d at 608. However, that case is inapposite here, because it involved the charge of terroristic threatening, committed if a person "threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony: ... With the intent to terrorize, *or in reckless disregard of the risk of terrorizing,* another person[.]" HRS § 707–715(1) (1993) (emphasis added).

 On appeal, the State again references the *mens rea* of the crime of terroristic threatening, and in doing so argues that, [a]lthough the State agrees with [Yamamoto] that the word "risk" in the instruction is more akin to a reckless state of mind than to an intentional state of mind, the instruction did not specifically include the words "recklessly disregard." Thus, the word "risk" in the instruction at issue appears to be superfluous, and indeed, has little meaning at all.

Answering Brief at 21. The jury is presumed, however, to have followed the court's instructions, *State v. Amorin,* 58 Haw. 623, 629, 574 P.2d 895, 899 (1978), and each of them, and in the complete absence of indication to the contrary in the record, we cannot conclude that the jury ignored the particular instruction *sub judice.* It was erroneous, and "[i]t is grave error to submit a criminal case to a jury without accurately defining the offense charged and its elements." *State v. Pinero,* 70 Haw. 509, 527, 778 P.2d 704, 715 (1989) (citation, internal quotation marks and brackets omitted).

 "Still, erroneous instructions are presumptively harmful and are a ground for reversal *unless* it affirmatively appears from the record as a whole that the error was not prejudicial." *Id.* at 527, 778 P.2d at 716 (citation, internal quotation marks and brack-

ets omitted; emphasis added). *See also State v. Holbron,* 80 Hawai'i 27, 32, 904 P.2d 912, 917 (1995) ("the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.... [If so], then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside" (internal block quote format and citations omitted)). In this respect, the State argues that

[the] evidence evincing [Yamamoto's] intent to both restrain and terrorize [Ebata] was overwhelming. In addition to three independent witnesses' testimony, [Yamamoto] himself admitted holding [Ebata] against her will and to pointing a knife at her. The State submits that [Yamamoto's] conduct, under the circumstances of this case was clearly intended to cause [Ebata] alarm that she could be hurt or even killed. In sum, the court's instruction which included the word "risk" would have had no impact on the jury's kidnapping verdict at all, for the evidence illustrated only that [Yamamoto's] conscious object was to cause [Ebata] to fear for her life.

Answering Brief at 22 (citation omitted).

We acknowledge that some might consider the State's evidence complete and compelling, and Yamamoto's allegations, assertions and arguments in his own defense far-fetched and sketchy. However, his defense—that his intent in restraining Ebata was not to terrorize her, but to get her to listen and to explain—was his only remaining defense after the court refused his jury instruction on choice of evils. It was a defense he had presented with dogged consistency, from pretrial motions through closing arguments to the jury. And it was a defense that was wholly negated by the court's erroneous jury instruction.

Once it was established that Yamamoto restrained Ebata and wielded the knife in close and ambiguous proximity, it was *ipso facto* also established that Yamamoto intended at least "the *risk* of causing another person serious alarm for his or her personal safety." (Emphasis added.) The latter established, and hence the crime complete un-

der the court's erroneous jury instructions, it was, for the jury, neither here nor there whether Yamamoto pointed the knife purposively or, as he claimed, in mere willy-nilly gesticulation. It was likewise inconsequential what had happened during the several months leading up to the incident and whether, as a result, Yamamoto had indeed intended to terrorize Ebata as he restrained her, as required for a kidnapping conviction, properly understood. In essence, the court's erroneous jury instruction deprived Yamamoto of his only defense to the kidnapping charge.

And presuming, as we must, that the jury followed the court's instructions, *Amorin,* 58 Haw. at 629, 574 P.2d at 899, there is a reasonable possibility the jury found that Yamamoto restrained Ebata while intending the mere risk of terrorizing her, and thereupon, without more, convicted him of kidnapping. But that is not the statutory crime, and hence, no crime at all. HRS § 701–102(1).

Given all this, we cannot agree with the State that the error was harmless beyond a reasonable doubt, no matter how cogent the State's evidence. We discern a distinctly reasonable possibility that the error might have contributed to Yamamoto's kidnapping conviction, and it cannot stand. *Holbron,* 80 Hawai'i at 32, 904 P.2d at 917.

 In considering whether to reverse or remand for a new trial on the kidnapping charge on account of the court's erroneous jury instruction, we must inquire whether there was sufficient evidence to support the charge. *State v. Malufau,* 80 Hawai'i 126, 132, 906 P.2d 612, 618 (1995). The test on appeal for sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact." *State v. Ildefonso,* 72 Haw. 573, 576, 827 P.2d 648, 651 (1992) (citations omitted). *See also State v. Tamura,* 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981). "Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a man of reasonable caution to reach a conclusion." *Ildefonso,* 72 Haw. at 577, 827 P.2d at 651 (citation, internal quotations marks and ellipsis omitted). "The jury, as the trier of fact, is the sole judge of the credibility of witnesses or the weight of the evidence." *Tamura,* 63 Haw. at 637–38, 633 P.2d at 1117 (citations omitted).

 Viewing the evidence below in the light most favorable to the State, and respecting the prerogatives of the jury in matters of credibility and weight of the evidence, there was clearly substantial evidence that Yamamoto intentionally or knowingly restrained Ebata with the intent to terrorize her. HRS § 707–720(1)(e). However, with respect to the sufficiency of the evidence, we take note of Yamamoto's second point on appeal, that there was insufficient evidence to support the jury's finding that he did not voluntarily release Ebata, a finding that enabled the court to convict him of kidnapping as a class A felony, instead of a class B felony. HRS § 707–720(3). In this connection, Yamamoto argues that

> the State fails to address the statutory intent behind the language [of HRS § 707–720(3)] wherein the statute specifically mandates that a kidnapper must receive a lesser sentence if the victim is released **"prior to trial."** By legislating that the release may occur prior to trial and not arrest, the statute coerces a kidnapper to release a victim.
>
> It may seem ridiculous that a person could be considered to have acted "voluntarily" after being ordered with guns pointed at him; however, even with a gun pointed at one's head, a person can still refuse to release the victim.
>
> Therefore, the concept of "voluntariness" in regards to [HRS § 707–720] is to be interpreted broadly and [Yamamoto's] release of the victim should be considered "voluntary" as a matter of law.

Reply Brief at 5 (bold emphasis in the original).

 Yamamoto cites no authority for his contentions about "statutory intent" and the broad interpretation of the term "voluntary" thereby mandated. Indeed, without passing upon what the legislature did intend in enacting the HRS § 707–720(3) mitigation defense, we observe that the Commentary on §§ 707–720 to 722 explains, instead, that

[t]he statutory provision for mitigation, in cases where the victim is released unharmed, is intended (1) to differentiate according to the severity of the actual harm involved, and (2) to encourage the actor to proceed less dangerously once the criminal course of conduct has begun.

On Yamamoto's second point on appeal, suffice it to say that, viewing the evidence in the light most favorable to the State, there was substantial evidence that Yamamoto did not release Ebata voluntarily, where he did so only after the police trained their weapons upon him, and only after they ordered him to do so no less than three times.

Accordingly, we vacate the Yamamoto's conviction and sentence for kidnapping and remand for a new trial on that charge.

■■■ We are left, finally, with Yamamoto's conviction for terroristic threatening in the first degree, and his last issue on appeal, concerning the court's refusal to give his jury instruction on the complete defense of choice of evils.

> Our cases have firmly established that a defendant is entitled to an instruction on every defense or theory of defense having *any* support in the evidence, provided such evidence would support the consideration of that issue by the jury, no matter how weak, inconclusive, or unsatisfactory the evidence may be. However, this court has also noted that where evidentiary support for an asserted defense, or for any of its essential components, is clearly lacking, it would not be error for the trial court to refuse to charge on the issue or to instruct the jury not to consider it.

*State v. Sawyer*, 88 Hawai'i 325, 333, 966 P.2d 637, 645 (1998) (citations, internal quotation marks and brackets omitted; emphasis in the original). Because we agree with the argument made below by the State, *supra*, that there was not a scintilla of evidence adduced at trial of the "imminent harm or evil" expressed in Kobayashi's threats, an essential component of the choice of evils defense, HRS § 703–302(1) (1993), we conclude that the court properly refused Yamamoto's jury instruction on choice of evils.

Accordingly, we affirm Yamamoto's conviction and sentence for terroristic threatening in the first degree.

### IV.

The June 7, 2000 judgment is affirmed in part and vacated in part. We affirm the conviction and sentence for terroristic threatening in the first degree. We vacate the conviction and sentence for kidnapping and remand for a new trial on that charge.