***FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER***

Electronically Filed
Supreme Court
SCWC-12-0000359
29-NOV-2013
09:20 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o—

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee.

vs.

SHANE FLORES,
Petitioner/Defendant-Appellant,

and

FLOYD ORSBORN and ROBERT LOGSDON,
Respondents/Defendants.

SCWC-12-0000359

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000359; CR. NO. 10-1-0591)

November 29, 2013

RECKTENWALD, C.J., NAKAYAMA, ACOBA, McKENNA, AND POLLACK, JJ.

OPINION OF THE COURT BY ACOBA, J.

We hold, first, that the Circuit Court of the First

Circuit (the court)[1] should have given a jury instruction on the

lesser-included offense of Unlawful Imprisonment in the First

_____

[1] The Honorable Karen S.S. Ahn presided.

Degree, Hawaiʻi Revised Statutes (HRS) § 707-721 (Supp. 2008)[2], in this case, where Petitioner/Defendant-Appellant Shane Flores (Flores) was charged with the offense of Kidnapping, HRS § 707-720(1)(e) (Supp. 2008)[3].  Second, we conclude that the court's failure to give the instruction on the lesser-included offense was not harmless, overruling State v. Haanio, 94 Hawaiʻi 405, 16 P.3d 246 (2001), only to the extent that Haanio would hold such error to be harmless beyond a reasonable doubt.  See Haanio, 94 Hawaiʻi at 415-16, 16 P.3d at 256-57.  Therefore, we vacate the July 26, 2013 judgment of the Intermediate Court of Appeals (ICA) and the March 30, 2012 Amended Judgment of Conviction and Sentence of the court, and remand the case for proceedings in accordance with the holding herein.

---

[2]     HRS § 707-721 provides:

(1) A person commits the offense of unlawful imprisonment in the first degree if the person knowingly restrains another person under circumstances which expose the person to the risk of serious bodily injury.

(2) Unlawful imprisonment in the first degree is a Class C felony.

[3]     HRS § 707-720 provides, in relevant part:

(1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:
. . . .
        (e) Terrorize that person or a third person[.]

(2) Except as provided in subsection (3), kidnapping is a class A felony.

(3) In a prosecution for kidnapping, it is a defense which reduces the offense to a class B felony that the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial.

I.

A.

The instant case involves an incident that took place on March 30, 2010 at 133 Kilea Place in Wahiawa, the home of Aaron Taum (Aaron) and Patricia Kekipi (Patricia). On the night of the incident, Aaron, Patricia and their baby daughter, as well as Justin Madeyski (Justin) and Skye Batalona (Skye), were at the residence.

On April 14, 2010, Respondent/Plaintiff-Appellee State of Hawaiʻi (the State) filed an indictment alleging forty-two counts against Flores, Floyd Orsborn (Orsborn) and Robert Logsdon (Logsdon) in connection with the March 30, 2010 incident. Only Count 4 for Kidnapping, HRS § 707-720(1)(e) (Supp. 2008), is relevant to the instant Application. The indictment stated: "COUNT 4: On or about the 30th day of March, 2010, in the City and County of Honolulu, State of Hawaiʻi, [Flores] and [Orsborn] did intentionally or knowingly restrain Aaron Taum [(Aaron)], with intent to terrorize him or a third person, thereby committing the offense of Kidnapping, in violation of Section 707-720(1)(e) of the [HRS]."

B.

The jury trial began on October 4, 2011, with Flores, Orsborn and Logsdon as co-defendants.[4]

---

[4] Only the testimony relevant to the issue on appeal to this court is recounted.

3

### 1. Patricia's Testimony

On October 5, 2011, Patricia, the first witness, testified as to the following events that took place on March 30, 2010. Patricia, Aaron, Justin and Skye were outside at a picnic table, and her baby was sleeping inside the house. She observed a car pull into their driveway, heard what she thought was a gun being cocked, and saw a person walking, around her vehicle (an Xterra) and toward them wearing a light-colored sweatshirt with something covering the bottom of his face, and a handgun in his hand. She saw another person walk around the vehicle wearing darker colored clothing.

The man with the lighter shirt said "everybody in the house, everyone in the house" in a loud tone of voice. She then went toward the house, through the kitchen door and "everybody was getting up like they were ready to go in the house." Patricia went to the bedroom and grabbed her gun, put it in her waistband and started to walk back toward the kitchen, as Justin and Skye were coming into the house.

After hearing what sounded like a "body slam," she started to walk toward the kitchen door and heard a gunshot. She then ran onto the porch, while she pulled out her gun.

Once outside, Patricia saw "Aaron with his back up against the house . . . sort of in a seated position, and he was kicking and punching towards the two guys that -- that were right in front of him." She saw a gun on the ground next to the man

with darker-colored clothing, and he turned, picked up the gun, and started to turn toward Aaron. Patricia thought the man with the gun was going to kill Aaron.

Patricia fired her gun toward the man with the darker clothing, who was facing Aaron at the time. She was about five feet away. Around her forth or fifth shot, the man with the lighter clothing started shooting toward her, from near the front passenger side of her "Xterra" automobile. She continued firing at the two men until she ran out of ammunition. She then ran into the house, threw her cell phone at Justin, and told Justin and Skye to call the police.

Back in the house, she grabbed Aaron's gun from the top of the refrigerator, but did not know how to use it, so she ran back to where she stored her gun, and swapped in an extra magazine. She went outside again and told Aaron to go into the house. When Aaron entered the house, she noticed that he had a handgun in his hand that did not belong to them, and observed that Aaron had an injury to his arm.

On cross-examination, defense counsel asked Patricia, inter alia, the following questions regarding the altercation:

> Q. Now, the man with a gun in his hand outside [man wearing light-colored clothing], he's just holding it, right?
> A. Yes.
> Q. And he's not waiving it at anyone?
> A. No.
> Q. He's not pointing it at anyone?
> A. No.
> Q. He doesn't hold it to anyone's head, right?
> A. No.
> Q. He just sort of had the gun?
> A. Yes.
> Q. He didn't say he was going to hurt anyone?

5

```
A.    No.
Q.    He didn't make a threat against anyone?
A.    No.
. . . .
Q.    So no threats.  He just says everyone go in the house?
A.    Yes.
```

(Emphases added.)

## 2.  Aaron's Testimony

Aaron testified as to the following.  He was sitting at the picnic table when he heard a car pull up to their house. Aaron saw two men come toward them, both had guns.  One was wearing a white long-sleeve shirt with a black bandanna over his face, and the other one was wearing a dark shirt with a lighter-colored bandanna.  "[The men] said shut up, everybody get in the house."  His "girlfriend said, you know, my baby's in the house, please, you know.  And they said shut up, everybody get up, go in the house."  According to Aaron they "all stood up, and . . . walked . . . from the picnic table up the stairs [with the two guys behind them.  He] . . . took a half step into the house, and then . . . thought better of it."  The two men "told [him] to stop and to come down."

Seemingly, Aaron was then instructed to go back up the stairs, walking in between the two men.  Aaron said to the man behind him, "you know, look, please, we don't have anything here, we have nothing."  "[The man behind him] said shut up, you know, and something like keep going or hurry up.  And I get up to the top step, the last one, and I kind of turn around like, no, you know, please, really, we have nothing.  And he just puts the gun

right to the back of my head.  And I put my hands up like, ho, you know, like all right and walked in through the security screen door . . . ."

As they entered the house, Aaron turned and grabbed the gun and tried to shoot the man in the lighter-colored clothing. He discovered that there were no bullets in the gun and started hitting the man with the gun.  Then, Aaron fell down the stairs and both men began to attack him while he was on the ground.  He saw them point a gun at his head, then heard gunshots going off around him, eventually realizing that Patricia was shooting at the two men.  Aaron received an injury to the head and was shot in the arm at one point.  He then ran behind the house, told Patricia to close the door and get into the house, and yelled out to someone to call the "cops" because he had been shot.

Aaron also testified to the previous robbery that had taken place at their home, including the fact that during that prior incident the robbers had taken marijuana that Aaron had been distributing out of the house.  Aaron stated he had never met any of the defendants previously.

On cross-examination, defense counsel asked Aaron the following questions regarding the arrival of the two men:

> Q.    Now, the two people that you see in March of 2010 that come up your driveway, you can't see either of their faces?
> A.    Correct
> . . . .
> Q.    And I think you made it clear that the handgun was in [the man with a white shirt's] right hand?
> A.    Yes.
> Q.    And he had it pointed down, right?
> A.    Down forward, yes.
> . . . .
> Q.    He wasn't trying to hide the gun though?

7

```
A.   No.
Q.   You could clearly see it?
A.   Yes.
Q.   And he wasn't waving it around?
A.   No.
Q.   He didn't make any demands of you, right?
A.   He did.
Q.   He did?
A.   Yes.  Told us to shut up and stand up, go in the
house.
Q.   He told you to shut up, right?
A.   And stand up and go in the house.
. . . .
Q.   Did he threaten to kill you?
A.   Not with words.
. . . .
Q.   Other than the things he had just said -- you claim he
said, he didn't make any other threats or demands, right?
A.   Correct.
```

Only Aaron was asked to come back outside the house.

### 3.  Justin's Testimony

Justin, who was at the house on March 30, 2010, testified to the following.  He was sitting at a picnic table when he saw two people coming down the driveway with their faces covered and carrying "at least one gun".  The man with the black shirt said "everyone stay calm, I want everyone to go in the house."  The four of them then started entering the house when the same man said, "you -- you wait," and Justin stopped because he did not know who they were talking to.  Aaron turned around and the man with the black shirt said, "yeah you[,]" so Justin continued walking into the house.  He saw Aaron remain at the top of the steps.

Once Justin was in the house, he heard a "scuffle" and what sounded "like a body slam or some kind of . . . loud noise." He heard a gun shot, heard Aaron yell "they shot me, they shot me" and saw Patricia walk out the door.  Then he saw Patricia

8

firing a gun from the porch. Justin called "911" and Aaron and Patricia came back into the house.

### 4. Skye's Testimony

Skye, another friend of Aaron and Patricia's who was present at the house, testified to the following. The four adults were outside at the picnic table when two "guys" came up wearing hoodies with their faces covered. "[T]hey told us to leave our stuff at the picnic table and get up against the house, get in like a line, and they wanted us to get in the house." She remembered that one of men was wearing gray and the other a dark color like navy blue or black. Skye remembered seeing one gun with them, but was not sure if both men had guns.

Skye listened to the men because "I know they had guns . . . . I think I [saw] one with a gun." Once the group moved toward the house, one of the men said "you, come here," and they were initially confused, but the men were talking to Aaron and pulled Aaron to the side. She knew they were talking to Aaron because they motioned to him.

Skye went into the house and once she reached the living room, she heard "slamming and . . . all kind of activity, like somebody was [] fighting, or like, you know shuffling around" in the house near to the door. Skye saw Patricia run outside with a gun. She could hear gunshots, but did not observe the shooting.

### 5. Orsborn's Testimony

Co-defendant Orsborn testified to the following. He

had contacted Flores early in the day and asked if Flores could obtain some marijuana for a party the next day. Flores told him that he could get some, and that Orsborn should meet him at a tattoo shop where their friend, co-defendant Logsdon, worked. Once he arrived at the shop, Flores said that he had to "take care of something, and he told me to just come along with him, help him out, catch his back." Flores told Orsborn that he had been "ripped off" from a previous drug deal and "wanted to . . . beat the guy up because the guy owed him money, and he knew he didn't have the money, so he just wanted to beat him up." Lodgson gave them a ride to Kilea Road in Wahiawa.

When they exited the car and started walking toward the driveway, Flores gave him a baton and said, "here, take this, you know, in case anyone jumps in or whatever[.]" Orsborn put it into his backpack. When they reached the end of the driveway, Flores pulled a gun out of his bag, and Orsborn asked him "what that was for." Flores said, "Don't worry. You don't have to use it. Just sounds like there's people there and I don't know who it is, so just take it, and just have it out so no one tries to do anything crazy." Flores also told him to cover his face, and Orsborn pulled down his grey bandana over his face. Orsborn was wearing a grey pullover sweater and black trousers, and Flores was wearing a dark sweater.

When they arrived at the house, Orsborn saw a lot of people and thought that none of them really matched the description of drug dealers. He "was kind of shocked at first,

and then they all freaked out, and they stood up, and by that time I made it around by the front of the table[.]" Aaron was "freaking out," and Orsborn had the gun in his hand, pointed down. Orsborn heard Flores tell Aaron to be quiet and calm down, while one of the girls was saying that she had a baby in the house. Orsborn said "[g]o ahead, go in the house[.]" Patricia ran up the stairs into the house, followed by Justin and Skye. He heard Flores tell "the other guy," Aaron, to "stay back, to stay outside." He heard Flores "telling him to just shut up and calm down."

From the porch, Orsborn heard Flores and Aaron hit the ground, turned, and saw them fighting. He was just inside the door to make sure no one was running out, but didn't know what he was supposed to do. Orsborn heard a gunshot, jumped off the porch and heard Flores say, "[h]e shot me." Aaron was on top of Flores with a gun in his hand, and Orsborn tried to pull Aaron back, and said "[l]et's get out of here."

As Orsborn bent over to help Flores up, he heard more gunshots, but did not see who was shooting. He felt shots going through him. Orsborn and Flores crawled behind the "Xterra" vehicle, and Orsborn fired a gun into the air and then a few times back at the house. The two men started heading back down the driveway.[5]

_____

[5] Co-defendant Logsdon was the last witness to testify at trial. He testified that he had reluctantly agreed to give Flores and Orsborn a ride from the tattoo shop on March 20, 2010. Later, he received a call from Flores telling him they were "in trouble" and to come "pick them up" where he had

(continued...)

11

C.    Instructions and Verdict

Flores did not testify at trial.  With respect to the jury instructions, Flores' defense counsel requested that the court give an instruction on the lesser-included offense of Kidnapping – Unlawful Imprisonment in the First Degree, HRS § 707-721 (Supp. 2008), as to each individual.  The following exchange took place:

> [Attorney for Flores]: Since you're thinking about an attempt on the kidnapping –
> THE COURT:  No, I've already said I'm not inclined to give the attempt on kidnapping.
> [Attorney for Flores]:  Okay.  I'd like the [c]ourt to consider the lesser included offense on the kidnapping of unlawful imprisonment in the first degree, which is that person knowingly restrains another person under circumstances which expose the person to the risk of serious bodily injury, which I think would fit at least one version of the facts.
> That they're telling these people to get in the house while they're armed with guns.  That would be a lesser, and I -- you know, I --
> THE COURT:  Why is there, if they believe, theoretically, I'm assuming that if they believe Orsborn, there is no restraint.
> [Attorney for Flores]:  If they believe Orsborn.
> THE COURT:  Right.  That he said, Go, go in the house. You have your baby, go in the house, and that they all trooped in there.
> [Attorney for Flores]:  But if they believe Patricia, [s]he's saying she was ordered to go in the house by someone with a gun.
> THE COURT:  Right, and that's kidnapping right there. That's restraint by threat -- by threat of force.
> [Attorney for Flores]:  That's also unlawful imprisonment.
> THE COURT:  Well, they would have to find that they did not intend to terrorize those people when they did so.
> [Attorney for Orsborn]:  And they certainly didn't --
> THE COURT:  Is there a rational basis to acquit if they believe all that?
> [Attorney for Flores]:  Depends.  Like you said, you have to parse out what the different people say.  Since we don't know which testimony people are going to believe, and there was so much different testimony, I think the safe thing to do is to give the instruction.

---

[5](...continued)
dropped them off.  Logsdon was driving them to the hospital when he was stopped by the police.

12

> [Deputy Prosecuting Attorney]: Can you read out unlawful imprisonment 1 again, [] or can I see it.
> [Attorney for Orsborn]: While they're doing that, Judge, I join in this, from the perspective that, obviously, nobody followed, or [Patricia] didn't follow, even if you say she was instructed, she didn't follow it. She came back out with her gun shooting people.
> THE COURT: Well, but it's not her actions that are in question. This trial is about the defendants' actions, state of mind.
> [Attorney for Orsborn]: I understand. But when you look at everything in context, I think you have to look at everything in context.
> THE COURT: Whether she was terrorized, she doesn't have to be terrorized for kidnapping to occur. The intent, have to [intend] to [be] terrorized, that's all.
> Let's go off the record.
> (Off the record.)
> <u>THE COURT: Back on the record.</u>
> <u>I'm going to decline to give a lesser to kidnapping and to</u>
> <u>any lessers to the kidnappings</u>.

(Emphases added.) As indicated, the court declined to give the instruction.

The court read the jury instructions on October 14, 2011, in relevant part, as follows:

> In Count 4, defendant Shane Flores is charged with the offense of Kidnapping. A person commits the offense of Kidnapping if he intentionally or knowingly restrains a person with intent to terrorize that person or a third person.
> There are three material elements of the offense of Kidnapping, each of which the prosecution must prove beyond a reasonable doubt.
> These three elements are:
> 1. That on or about March 30, 2010, in the City and County of Honolulu, State of Hawaiʻi, defendant Shane Flores restrained Aaron Taum; and
> 2. That the defendant Shane Flores did so intentionally or knowingly; and
> 3. That the defendant Shane Flores did so with the intent to terrorize Aaron Taum or a third person.
> . . . .
> In Count 4, if you find that the prosecution has proven beyond a reasonable doubt that the defendant Shane Flores committed the offense of Kidnapping, then, you must also answer the following three questions on a special interrogatory which will be provided to you.[6]

_____

[6] These interrogatory questions go to whether the Kidnapping offense should be reduced from a class A to class B felony. HRS § 707-720(3) provides that "[i]n a prosecution for kidnapping, it is a defense which reduces the offense to a class B felony that the defendant voluntarily released the

(continued...)

13

1. Has the prosecution proven beyond a reasonable doubt that prior to trial, the defendant Shane Flores did not release Aaron Taum voluntarily?
2. Has the prosecution proven beyond a reasonable doubt that prior to trial, the defendant Shane Flores did not release Aaron Taum alive and not suffering from serious or substantial bodily injury?
3. Has the prosecution proven beyond a reasonable doubt that prior to trial the defendant Shane Flores did not release Aaron Taum in a safe place?
You must answer each of these questions separately. Your answer to each of these questions must be unanimous.

On October 18, 2011 the jury stated its verdict on-the-record, finding Flores guilty in Count 4, of kidnapping Aaron Taum. The jury answered "Yes" to special interrogatory question 1 and "No" to questions 2 and 3.[7]

III.

A.

On appeal to the ICA, Flores argued, among other things, that there was support in the evidence to instruct the jury on Unlawful Imprisonment in the First Degree, that pursuant to this court's case law Flores was entitled to an instruction, and therefore the court erred in failing to instruct the jury. Flores acknowledged that Hawaiʻi precedent states that the court's error in failing to instruct the jury on a lesser-included offense is harmless where the jury convicts on the charged offense or a greater lesser-included offense.

---

[6](...continued)
victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial."

[7] In order to reduce Kidnapping from a class A to class B felony, the prosecution needed to disprove only one of the three elements set out in the special interrogatory. Since the jury found that the State disproved the first of the three elements, the offense was not downgraded to a class B felony.

However, he argued that the court's failure to instruct the jury on the lesser-included offense in this case violated his constitutional right to effective assistance of counsel, inasmuch as "jury-instruction precedent does not take into account the distinct possibility that if counsel for the defense had been allowed to argue the lesser-included offense to the jury, that the jury would have found that argument compelling and convicted on the lesser-included offense."

Flores next cited to the constitutional right to present a defense under the Sixth Amendment to the U.S. Constitution and article I, section 14 of the Hawaiʻi Constitution, and argued that the court's failure to give the lesser-included instruction violated that right. Similar to his argument with respect to effective assistance of counsel, Flores alleged that the court's ruling "preclud[ed] him from arguing that he was guilty only of the lesser-included offense and thereby mitigating his penal liability."

B.

In its Answering Brief[8], the State argued that there was no rational basis in the evidence to give the Unlawful Imprisonment instruction, and that even assuming, arguendo, that

---

[8]     With respect to Flores points of error related to Counts 13, 15, and 16, all having to do with firearm violations, the State conceded in its Answering Brief that Flores' Judgment of Conviction and Sentence must be vacated, and the charges dismissed without prejudice, for failure to allege the requisite mens rea. See State v. Gonzalez, 128 Hawaiʻi 314, 324, 288 P.3d 788, 798 (2012); State v. Nesmith, 127 Hawaiʻi 48, 54, 276 P.3d 617, 623 (2012).

15

there was a basis for the instruction, the court's failure to give it was harmless pursuant to State v. Haanio, 94 Hawaiʻi 405, 415-16, 16 P.3d 246, 256-57 (2001), because Flores was convicted of the greater offense of Kidnapping. The State asserted that pursuant to State v. Kupau, 76 Hawaiʻi 382, 395, 879 P.2d 492, 500 (1994), overruled on other grounds by Haanio, 94 Hawaiʻi at 407, 16 P.3d at 248, a "trial court 'is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him of the included offense.'" Kupau, 76 Hawaiʻi at 390, 879 P.2d at 495 (citing HRS § 701-109(5) (1993)). The State maintains that Flores does not and cannot argue that the jury could have rationally aquitted [Flores] of Kidnapping and convicted him of Unlawful Imprisonment [1][.]" (Emphasis in original.) The State related the evidence as follows:

> Here, the evidence showed [Flores] and Orsborn appeared at the scene with their faces partially covered by bandanas and brandishing firearms. Given the facts of this case, there was no rational basis to support a contention that the jury could have rationally acquitted [Flores] of Kidnapping and convicted him of Unlawful Imprisonment in the First Degree.

Alternatively, the State argued that Haanio is controlling precedent and requires that the conviction be upheld. In Haanio, the State explained, this court held that an error in failing to give appropriate included offense instructions requested by a party "is harmless when the jury convicts the defendant of the charged offense or of an included offense greater than the included offense erroneously omitted from the

16

instructions.'" (Quoting Haanio, 94 Hawaiʻi at 415, 16 P.3d at 256). Thus, the State alleged, the court's omission in giving the instruction was harmless in any event.

### C.

On the issue of the jury instruction, the ICA held that any error in failing to instruct the jury as to first degree Unlawful Imprisonment was harmless. Id. at *2. It explained that, "assuming arguendo that there was evidence supporting a jury instruction on unlawful imprisonment in the first degree, the [] [c]ourt's refusal to give such an instruction was harmless error because the jury convicted Flores of the greater charged offense and, thus, would not have reached the absent lesser offense." Id. (citing Haanio, 94 Hawaiʻi at 415-16, 16 P.3d at 256-57; State v. Pauline, 100 Hawaiʻi 356, 381, 60 P.3d 306, 331 (2002)).

### IV.

In his Application to this court, Flores asks whether the ICA erred "in holding that the [] court's refusal to instruct the jury on the lesser-included offense of Unlawful Imprisonment in the First Degree on the Kidnapping charge in Count 4 was harmless error?" Flores contends that this court should reconsider the harmless error holding in Haanio for three reasons. First, he argues that although it is error for the trial court to fail to instruct the jury on a lesser-included offense, such error is "effectively unreviewable on appeal."

17

Second, Flores alleges that the harmless error holding in Haanio "is premised on the convenient fiction that juries always scrupulously follow the court's instructions." Third, Flores contends that "finding harmless error in the court's failure to instruct the jury on the lesser-included offense where the defendant is convicted of the greater, ignores the possibility that if the defendant's attorney had been given the opportunity to argue the lesser that he/she [might] have convinced the jury to acquit on the charged offense and convict on the lesser." The State did not file a Response.

V.

First, it must be determined whether the court erred in failing to give the requested lesser-included offense jury instruction. Then, assuming that any error would be harmless under Haanio, because Flores was convicted of the greater offense of kidnapping, it is considered whether this court should continue to apply the Haanio rule regarding harmless error where lesser-included offense instructions are omitted.

A.

Haanio represented a departure from this court's earlier precedent with respect to jury instructions on lesser-included offenses. See Kupau, 76 Hawaiʻi at 395, 879 P.2d at 500. In Haanio, the trial court proposed giving several lesser-included offense instructions to the jury, the defendant objected, but the trial court still gave the instructions. 94

18

Hawaiʻi at 408-09, 16 P.3d at 249-50. The defendant appealed, citing Kupau, which gave the trial court discretion in deciding whether to give included offense instructions. Id. at 412-13, 16 P.3d at 253-54 (citing Kupau, 76 Hawaiʻi at 395, 879 P.2d at 500). Haanio mandated that "trial courts must instruct juries as to any included offenses when 'there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense,' and to the extent that Kupau stands to the contrary, we overrule it." Id. at 413, 16 P.3d at 254 (quoting HRS § 701-109(5) (1993)).

The rationale expressed in Haanio for the implementation of such a rule, even where a lesser-included instruction is objected to by one of the parties at trial, was that the public interest is best served by the jury assessing criminal liability if it exists in the evidence:

> The judicial objectives within the context of the criminal justice system are to assess criminal liability and to determine appropriate punishment if and when warranted. Acceding to an 'all or nothing' strategy, albeit in limited circumstances, forecloses the determination of criminal liability where it may in fact exist. Thus, elevating a 'winner take all' approach over such a determination is detrimental to the broader interests served by the criminal justice system. We now conclude that the better rule is that trial courts must instruct juries on all lesser included offenses as specified by HRS § 701-109(5), despite any objection by the defense, and even in the absence of a request from the prosecution.

Id. at 414, 16 P.3d at 255 (emphasis added). This court went on to state that "[w]e discern no constitutional or substantial right of a defendant not to have the jury instructed on lesser-included offenses. . . . [s]imilarly, we can conceive of no right

19

of the prosecution to prevent the jury from considering included offense instructions supported by the evidence." Id. at 415, 16 P.3d at 256.

Indeed, with respect to instructions on lesser-included offenses, it is axiomatic that "providing instructions on all lesser-included offenses with a rational basis in the evidence is essential to the performance of the jury's function." State v. Stenger, 122 Hawaiʻi 271, 296, 226 P.3d 441, 466 (2010) (citing Haanio, 94 Hawaiʻi at 415, 16 P.3d at 256). Thus, pursuant to this court's precedent, jury instructions on lesser-included offenses must be given where there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense. Id.

B.

As noted, Flores was charged with, and subsequently convicted of Kidnapping Aaron. To reiterate, the Kidnapping statute, HRS § 707-720, states in relevant part:

> (1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:
>    . . . .
>    (e) Terrorize that person or a third person[.]
> (2) Except as provided in subsection (3), kidnapping is a class A felony.
> (3) In a prosecution for kidnapping, it is a defense which reduces the offense to a class B felony that the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial.

(Emphases added.) The offense of Unlawful Imprisonment in the First Degree, HRS § 707-721, as indicated, states that:

20

> (1) A person commits the offense of unlawful imprisonment in the first degree if the person <u>knowingly restrains another person</u> under circumstances which expose the person to the risk of serious bodily injury.
> (2) Unlawful imprisonment in the first degree is a class C felony.

(Emphasis added.)

Unlawful Imprisonment in the First Degree is in fact a lesser-included offense of Kidnapping. According to the Commentary to HRS §§ 720-720 to 722, "[t]hese three offenses [kidnapping, unlawful imprisonment in the first degree, and unlawful imprisonment in the second degree] <u>are gradations</u> based on the underlying conduct of interference with a person's liberty. <u>The gradations are based on the seriousness of the circumstance or purpose attending this interference</u>." (Emphases added.)

Under HRS § 701-109(4), one offense is included in another if:

> (a) <u>It is established by proof of the same or less than all the facts required to establish the commission of the offense charged;</u> or
> (b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or
> (c) It differs from the offense charged only in the respect that <u>a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission</u>.

(Emphases added).

HRS § 701-109(4)(a) would not appear to apply here. HRS § 707-720 does not require proof that a person expose another person to the risk of serious bodily injury to prove Kidnapping. However, exposure to the risk of serious bodily injury is a requirement of establishing the offense of Unlawful Imprisonment

21

in the First Degree under HRS § 707-720. In other words, establishing the offense of Unlawful Imprisonment in the First Degree requires proof of the element of circumstances involving exposure to the risk of serious bodily injury. Therefore, Unlawful Imprisonment in the First Degree cannot be proved by the same facts or less than all the facts required to prove Kidnapping, and HRS § 701-109(4)(a) does not apply.

HRS § 701-109(4)(b) does not apply because there are no allegations of attempt.

However, HRS § 701-109(4)(c) does apply. An offense is a lesser included offense under HRS § 701-109(4)(c) if it either (a) creates a "less serious risk of injury" to the same person or (b) "a different state of mind indicating a lesser degree of culpability suffices to establish its commission." HRS § 701-109(4)(c) (emphasis added).

Unlawful Imprisonment in the First Degree implicates "a different state of mind indicating a lesser degree of culpability." HRS § 701-109(4)(c). Under the Kidnapping statute, HRS § 707-720(1), an individual must both intentionally or knowingly restrain the other person and have an additional intent with respect to the restraint, as described by HRS § 707-720(1)(a)-(g). However, under Unlawful Imprisonment in the First Degree, HRS § 707-721, an individual must only "knowingly restrain another person under circumstances which expose the person to the risk of serious bodily injury." Hence, the

requisite mental state for Unlawful Imprisonment does not require the additional intent, for example, the "intent to terrorize", that is present in the Kidnapping statute. This indicates that the requisite state of mind for Unlawful Imprisonment in the First Degree indicates a "lesser degree of culpability" than the requisite state of mind for Kidnapping.

Further, the Commentary to HRS §§ 707-720 to 722 supports the view that Unlawful Imprisonment in the First Degree involves a lesser degree of culpability than Kidnapping. As noted, it explains that Unlawful Imprisonment in the First Degree is a "gradation" of Kidnapping, and that "the gradations are based upon the seriousness of the circumstances or purpose attending [the] interference [with a person's liberty]." HRS §§ 707-720-722, cmt. "Where the restraint is for personal gain, or for certain purposes which are themselves unlawful the offense is termed 'kidnapping,' and the most severe sanctions apply." Id. (emphasis added). Less serious sanctions apply "[w]here the restraint poses a danger of serious injury." Id.

Terroristic threatening is itself unlawful. See HRS § 707-715. Thus, when an individual unlawfully restrains another with the intent to terrorize, his or her "purpose[ is] [itself] unlawful." Under the Commentary, then, unlawful restraint with the intent to terrorize is more "serious" than unlawful restraint that knowingly exposes another to the "risk" of serious bodily injury.

23

In sum, under HRS § 701-109(4)(c) Unlawful Imprisonment in the First Degree is a lesser-included offense of Kidnapping because Unlawful Imprisonment in the First Degree involves a less culpable mental state than Kidnapping.

                                    VI.

Having established that Unlawful Imprisonment in the First Degree is a lesser-included offense of Kidnapping, the relevant question pursuant to Haanio is whether any view of the evidence in this case presented a rational basis for the jury to acquit Flores of Kidnapping and, alternatively, to convict him of Unlawful Imprisonment in the First Degree.  To reiterate, a person commits Kidnapping, HRS § 707-720(1)(e), if he or she (1) "intentionally or knowingly restrains another person; (2) with intent to "terrorize that person or a third person[.]"[9]  HRS § 707-720(1)(e).  "Restrain" is defined, inter alia, as to "restrict a person's movement in such a manner as to interfere substantially with the person's liberty . . . [b]y means of force, threat, or deception[.]"  HRS § 707-700 (Supp. 2008).  A person commits the offense of Unlawful Imprisonment in the First Degree if he or she (1) "knowingly restrain[s] another person[,]" (2) "under circumstances which expose the person to the risk of serious bodily injury."  HRS § 707-721.  "Serious bodily injury"

---

      [9]    In State v. Yamamoto, 98 Hawaiʻi 208, 46 P.3d 1092 (2002), this court held that the trial court erred when it instructed the jury that "[t]errorize means the risk of causing another person serious alarm for his or her personal safety."  98 Hawaiʻi at 217, 46 P.3d at 1101.  Yamamoto explained that such an instruction "has no basis in our criminal statutes."  Id.

is defined as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."  HRS § 707-700.

Under the State's theory of the case, Flores and Orsborn unlawfully kidnapped Aaron (and Patricia, Justin and Skye) when they stepped onto the property holding guns visible to others, and ordered the four people at the picnic table to go inside the house.  According to the State, Aaron and the others were restrained because they were directed to go into the house and did so.

The State also introduced evidence that could suggest to a jury that Flores restrained Aaron with the "intent to terrorize" him or a third person.  There was testimony at trial that Flores and Orsborn arrived at the house with their faces covered, and at least one of them was holding a gun when they told the four people at the house where to go.  From this, a jury could infer that Flores intended to terrorize Aaron and the others.  Aaron testified at trial that one of the men, while holding a gun in plain view, "[t]old us to shut up and stand up, go in the house."  Patricia, Justin, and Skye also testified that the men had at least one gun and told them to go into the house.  Aaron also related that one of the men put a gun to his head while Aaron walked into the house.

It is well-established that "[t]he law permits an inference of the requisite intent from evidence of the words or

conduct of the defendant." State v. Stuart, 51 Haw. 656, 657, 466 P.2d 444, 445 (1970) (citing Territory v. Ebarra, 39 Haw. 488, 490 (Terr. 1952)) (other citations omitted). See also In Interest of Doe, 3 Haw. App. 325, 332, 650 P.2d 603, 608 (App. 1982) (stating that circumstantial evidence could be used to assess the intent to terrorize, or reckless disregard of the risk of terrorizing, for the offense of terroristic threatening). From the testimony adduced at trial, a jury could infer that Flores acted in restraining Aaron with the intent to terrorize him. Therefore, there was evidence from which a jury could conclude that Flores committed the charged offense of Kidnapping Aaron because he "intentionally or knowingly restrain[ed] Aaron" with intent to "terrorize [him] or a third person[.]" See HRS § 707-720(1)(e).

In the alternative, the evidence at trial provided a rational basis for the jury to acquit Flores of Kidnapping, but find him guilty of the offense of Unlawful Imprisonment in the First Degree. First, in order to acquit Flores of Kidnapping, there would have to be a rational basis for finding that Flores did not have an intent to terrorize Aaron or a third person. Orsborn's testimony at trial stated that he and Flores went to the house in Wahiawa because Flores wanted to "beat someone up" who supposedly owed him money from a drug deal. Defense counsel for Flores appears to have adopted this evidence as part of Flores' theory of the case.

"Intent to terrorize" has not been defined by the legislature.  See Yamamoto, 98 Hawaiʻi at 217, 46 P.3d at 1101.  However, this court has construed "intent to terrorize" in the context of the offense of Terroristic Threatening, which requires as one of its elements, that the defendant commit the act "with the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]"  HRS § 707-715(1) (1993).  In State v. Pukahi, 70 Haw. 456, 776 P.2d 392 (1989), this court considered whether Terroristic Threatening was a lesser included offense of Extortion, and concluded that it was not, inasmuch as a jury could believe that a threat was made with the intent to require the recipient to pay over money but not with the intent to terrorize.  70 Haw. at 457, 776 P.2d at 393.  Pukahi explained:

> Appellant's argument assumes that a threat of bodily injury, uttered for the purpose of causing someone to yield control of property or services, necessarily is also intended to terrorize, or is made in reckless disregard of the risk of terrorizing the recipient.  That is not necessarily so.  <u>A jury could believe, in this case, that the threat, by appellant, to give the recipient black eyes, unless he paid a sum of money within a specified time, was made with the intent to require the recipient to pay over the money, and yet a jury could very well believe that such a threat was not made with the intent to terrorize</u>, or even in reckless disregard of the risk of terrorizing the recipient.

Id. (emphasis added).  See also State v. Alston, 75 Haw. 517, 536, 865 P.2d 157, 167 (1994) (noting that "a person could threaten another for the purpose of inducing that person's absence from an official proceeding without necessarily intending to terrorize, or recklessly disregarding the risk of terrorizing, the person.").

27

The commentary accompanying the Model Penal Code has construed "intent to terrorize" with respect to the difference between "unlawful restraint" and "kidnapping" in a similar manner.  Model Penal Code and Commentaries, vol. 1, § 212.2 cmt. at 240-41 (Official Draft and Revised Comments 1985).  It states that "[unlawful restraint] is distinguished from kidnapping [] by . . . the absence of any of the specified kidnapping purposes." Id. at 240.  In our criminal statutory scheme, Unlawful Imprisonment in the First Degree is distinguished from Kidnapping by the absence of the specified kidnapping purposes listed in HRS § 707-720(1)(a)-(g), including "terrorize that person or a third person[.]"  HRS § 727-720(1)(e).  The commentary notes that

> a person who restrains another for an insubstantial period of time or in a public place may be guilty of felonious restraint but not of kidnapping . . . . [F]or example, the actor who uses a gun to force another to drive him somewhere engages in unlawful restraint under circumstances exposing the victim to risk of serious bodily harm.  If he does so in order to terrorize the victim . . . he may be convicted of kidnapping.  But if his purpose is merely to obtain transportation, he is liable only for the lesser offense of felonious restraint.

Model Penal Code and Commentaries, supra, § 212.2 cmt. at 240-41.

As applied to this case, a jury could find that Flores did not intend to terrorize Aaron.  For example, a jury could find that Flores could have told Aaron to stay outside the house in order to talk to Aaron alone or to engage in a fight with him.  In closing argument defense counsel argued that

> [a]ll the witnesses in this case were clear, these two people didn't point their guns at anyone.  There weren't any threats made . . . .  If your intent is to terrorize someone and you have a gun, what you do is you start waving it around and tell them how you're going to kill them.  That's intent to terrorize.  But that's not what happened because that's not what was intended.  Holding the gun down in a safe manner is

> what you do when you want some people to think twice about
> jumping in, and that's exactly what [Orsborn] told you they
> were there to do.

Aaron testified on cross-examination that the man with the handgun had it pointed "[d]own forward" and that he did not wave it around or make any threats or demands.  Patricia also testified on cross-examination that the man with a gun did not wave it at anyone, hold it to anyone's head, or make any threats.  Taking this evidence into consideration, a jury could conclude that Flores did not have the requisite intent to terrorize to convict him of Kidnapping.

In order to convict Flores of Unlawful Imprisonment in the First Degree, to reiterate, he must have "knowingly restrain[ed]" Aaron "under circumstances which expose[d] [Aaron] to the risk of serious bodily injury."  HRS § 707-721.  As noted, from the testimony at trial the jury could determine that Flores "knowingly restrain[ed] Aaron" by demanding that Aaron (and the others) go into the house, while holding a gun.  Additionally, the jury could have found that Aaron was restrained "under circumstances which expose the person to the risk of serious bodily injury[.]"  HRS § 707-721.  If the jury believed Aaron's testimony, it could have concluded that, because Flores had a gun during the time when the four individuals at the house were told to go inside the house and Aaron was told to stay outside, and then a gun was put to Aaron's head, Aaron was exposed to the risk of serious bodily injury.

Based on the above, therefore, there was a rational basis for a verdict acquitting Flores of Kidnapping and convicting the defendant of the included offense of Unlawful Imprisonment in the First Degree.[10]  Haanio, 94 Hawaiʻi at 413, 16 P.3d at 254.  Accordingly, the court was required to give the requested jury instruction on the lesser-included offense of Unlawful Imprisonment in the First Degree.  The court erred in failing to do so.  See id. at 415, 16 P.3d at 256 ("The trial court's failure to give appropriate included offense instructions requested by a party constitutes error, as does the trial court's failure to give an appropriate included offense instruction that has not been requested.").

VII.

Pursuant to Haanio, however, the court's error in the instant case would be harmless.  Under Haanio, such error is harmless "when the jury convicts the defendant of the charged offense or of an included offense greater than the included offense erroneously omitted from the instructions."  Id. (emphasis added).  Haanio explained that "[t]he error is harmless because jurors are presumed to follow the court's instructions, and, under the standard jury instructions, the jury, 'in reaching a unanimous verdict as to the charged offense [or as to the greater included offense, would] not have reached, much less

---

[10]     Additionally, there may have been a basis in the evidence for an instruction on Unlawful Imprisonment in the Second Degree.  However, in light of this court's disposition to remand the case for a new trial, this issue need not be reached.

considered,' . . . the absent lesser offense on which it should have been instructed." Id. at 415-16, 16 P.3d at 256-57 (alterations in original) (quoting State v. Holbron, 80 Hawaiʻi 27, 47, 904 P.2d 912, 932 (1995)).

In this case, Flores was found guilty of kidnapping, the charged offense. As such, the court's failure to give the lesser-included Unlawful Imprisonment in the First Degree instruction would be deemed harmless under Haanio.

VIII.

A.

We reconsider Haanio's harmless error holding. That holding appears inconsistent with this court's precedent in Haanio and later cases "that 'juries are obligated to render true verdicts based on the facts presented; hence, barring their consideration of lesser-included offenses supported by the evidence undermines their delegated function . . . . Most significantly, an all or nothing approach impairs the truth seeking function of the judicial system.'" Stenger, 122 Hawaiʻi at 296, 226 P.3d at 466 (quoting Haanio, 94 Hawaiʻi at 415, 16 P.3d at 256) (citation omitted).

As this case illustrates, it has become apparent since Haanio was decided, that holding the failure to give a lesser-included offense where the defendant is found guilty as charged, harmless leaves the jury with the same "all or nothing" choice that had been condemned in Haanio. As Haanio held, "in our

31

judicial system, the trial courts, not the parties, have the duty and ultimate responsibility to insure that juries are properly instructed on issues of criminal liability." State v. Kikuta, 125 Hawaiʻi 78, 90, 253 P.3d 639, 651 (2011) (citing State v. Nichols, 111 Hawaiʻi 327, 335, 141 P.3d 974, 982 (2006); State v. Loa, 83 Hawaiʻi 335, 358, 926 P.2d 1258, 1281 (1996)); see also Haanio, 94 Hawaiʻi at 415, 16 P.3d at 256). Haanio explained that "[j]uries are obligated to render true verdicts based on the facts presented," and thus, "barring consideration of lesser included offenses supported by the evidence undermines their delegated function." Haanio, 94 Hawaiʻi at 415, 16 P.3d at 256 (emphasis added).

The function of the jury in rendering an accurate verdict based on the facts presented at trial is paramount in upholding the "truth seeking function of the judicial system." Id. "Our courts are not gambling halls but forums for the discovery of truth." Id. Accordingly, this court has held that:

> A trial court's failure to inform the jury of its option to find the defendant guilty of the lesser offense would impair the jury's truth-ascertainment function. Consequently, neither the prosecution nor the defense should be allowed, based on their trial strategy, to preclude the jury from considering guilt of a lesser offense included in the crime charged. To permit this would force the jury to make an 'all or nothing' choice between conviction of the crime charged or complete acquittal, thereby denying the jury the opportunity to decide whether the defendant is guilty of a lesser included offense established by the evidence.

Id. (emphasis added) (quoting People v. Barton, 906 P.2d 531, 536 (Cal. 1995)). Holding such errors harmless perpetuates the risk that the jury in any given case did not actually reach the result

that best conforms with the facts, because the jury was only presented with two options -- guilty of the charged offense or not guilty -- when in fact, the evidence may admit of an offense of lesser magnitude than the charged offense. Thus, the rationale in Haanio that the jury in such cases, "in reaching a unanimous verdict as to the charged offense or as to the greater included offense, would not have reached, much less considered the absent lesser offense[,]" is not viable.[11]

B.

The assumption underlying Haanio's harmless error holding is that if a jury found any of the elements of the greater offense to be lacking, it would find the defendant not guilty. After an acquittal there would be no reason to revisit the verdict to determine whether the defendant should actually have been convicted of a lesser-included offense, rather than acquitted altogether. It follows then, under the reasoning in

---

[11] The Hawaiʻi Criminal Jury Instructions as to included offenses provide that:

> 5.03 INCLUDED OFFENSE -- GENERIC
>
> If and only if you find the defendant not guilty of (charged offense), or you are unable to reach a unanimous verdict as to this offense, then you must consider whether the defendant is guilty or not guilty of the included offense of (included offense).
> A person commits the offense of (included offense) if he/she (track statutory language).
> There are (number) material elements of this offense, each of which the prosecution must prove beyond a reasonable doubt.
> These (number) elements are:
> . . . .

Hawaiʻi Standard Jury Instructions Criminal (recompiled 1991 ed. with amendments to June 2, 2005).

33

Haanio, that where the defendant is found guilty of the charged offense, the jury must have found that all of the elements of the charged offense were present, and thus, even if the jury had been instructed on the lesser-included offense, the jury would have convicted the defendant of the charged offense.

Such logic relies heavily on the supposition that a jury will always follows the court's instructions. See Holbron, 80 Hawaiʻi at 46, 904 P.2d at 931; State v. Knight, 80 Hawaiʻi 318, 327, 909 P.2d 1133, 1142. While this assumption is generally applied, it would be imprudent to ignore the "reality of human experience," see Beck v. Alabama, 447 U.S. 625, 642 (1980), that a jury, faced with an "all or nothing" option, may determine that the defendant was guilty of "something." Having only the charged offense as an option, the jury may prefer to find the defendant guilty as charged, rather than to acquit him or her of the offense entirely. On the other hand, if the lesser-included offense instruction is not given where there is a basis in the evidence for such an instruction, the jury may determine that although the defendant is guilty of "something," it will not convict the defendant of the charged offense and elect acquittal instead.

In either of these scenarios, the jury's verdict would not reflect the actual criminal liability of the defendant. In one case, applying the harmless error holding from Haanio would render the former error harmless inasmuch as the defendant would

34

be convicted of the charged offense, although in fact the defendant may be guilty of a lesser-included offense.  In the other case, the error would go unreviewed, inasmuch as the defendant would have been acquitted, although the defendant may have been guilty of an offense lesser than that charged.  Both errors could be prevented, and ultimately, the public interest in accurate outcomes would be served by the court completely instructing the jury on the law.  Haanio, 94 Hawaiʻi at 415, 16 P.3d at 256 (citing State v. Kupau, 76 Hawaiʻi at 395, 879 P.2d at 500).  See also State v. Feliciano, 62 Haw. 637, 643, 618 P.2d 306, 310 (1980) ("[I]t is well settled that the trial court must correctly instruct the jury on the law . . . .  This requirement is mandatory to insure the jury has proper guidance in its consideration of the issues before it.").

In a case such as this one, where the instruction on a lesser-included offense was not given by the court, it would appear more consonant with the public interest in accurate verdicts that the instruction be given.  As it currently stands, Haanio identifies the problem, but, in effect, does not provide an effective remedy.

IX.

Instead of continuing to follow Haanio's harmless error holding, Haanio is overruled to the extent that it holds the trial court's error in failing to give included offense instructions is harmless if the defendant was convicted of the

35

charged offense or of a greater included offense. In the context of jury instructions, this court has held that "[w]hen jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." State v. Sawyer, 88 Hawai'i 325, 329, 966 P.2d 637, 641 (1998) (quoting State v. Arceo, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996) (citations and internal quotation marks omitted). See also State v. Locquaio, 100 Hawai'i 195, 203, 58 P.3d 1242, 1250 (2002) (same).

As established supra, the court's jury instructions in this case were insufficient, inasmuch as they did not include the lesser-included offense of Unlawful Imprisonment in the First Degree.

Flores argues in his briefs on appeal that his defense counsel was precluded at closing argument from arguing that he was guilty of Unlawful Imprisonment in the First Degree instead of Kidnapping. As discussed supra, there was evidence to support a conviction on Unlawful Imprisonment in the First Degree, and defense counsel argued at closing that his client did not have the requisite "intent to terrorize" to be guilty of kidnapping. Thus, there was a rational basis for the jury to find Flores guilty of Unlawful Imprisonment in the First Degree, had the jury been given the appropriate instruction. The failure to instruct the jury on a lesser included offense for which the evidence

36

provides a rational basis warrants vacation of the defendant's conviction.  See Haanio, 94 Hawaiʻi at 415, 16 P.3d at 246 ("[T]he rational resolution of criminal liability issues in the criminal justice system and the proper administration of such issues at the trial judge and jury level require the giving of lesser included offense instructions.")  Thus, the judgment of conviction as to Kidnapping must be vacated and the case remanded for a new trial on Count 4, the Kidnapping charge.[12]

X.

As noted, the other arguments in Flores' Application are first, that the court's error in failing to instruct the jury on the lesser-included offense of Unlawful Imprisonment in the First Degree violated his constitutional right to present a defense.  Second, and relatedly, he argues that the court's error violated his constitutional right to effective assistance of counsel.  The basis for these arguments is that defense counsel was precluded from arguing at closing argument that Flores was guilty of the lesser-included offense.  These arguments all hinge on a disposition of the discussion supra, and therefore are not addressed further.

XI.

Based on the foregoing, the ICA's July 26, 2013 judgment and the court's March 30, 2012 judgment of conviction

---

[12]     In its SDO, the ICA dismissed Counts 13, 15, and 16 without prejudice for failure of the indictment to state the requisite mens rea for those offenses.  Flores, 2013 WL3364106, at *1-2.  Neither party challenges the ICA's holding as to these counts, and so the judgment of the ICA as to those counts stands.  See id.

37

and sentence with respect to Kidnapping, Count 4 of the indictment are vacated and Count 4 is remanded for a new trial.

Jeffrey A. Hawk,
for petitioner

Stephen Tsushima,
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Simeon R. Acoba, Jr.

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

