**Electronically Filed
Supreme Court
SCWC-18-0000332
22-APR-2020
01:03 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

STATE OF HAWAI'I, Respondent/Plaintiff-Appellee

vs.

ISRAEL VEGA MALAVE, Petitioner/Defendant-Appellant

_____

SCWC-18-0000332

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-18-0000332; 1FFC-17-0000115)

APRIL 22, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

AMENDED OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.    INTRODUCTION

Israel Vega Malave was convicted in the Family Court of the First Circuit on two counts of Sexual Assault in the First Degree for sexually assaulting his pre-teen stepdaughter

over a period of approximately two years.[1]  This case requires us to review two issues: the jurisdiction of the family court to try Malave and the propriety of instructing the jury on a lesser included offense.

The Intermediate Court of Appeals (ICA) rejected Malave's argument that the family court did not have jurisdiction, and that it should have instructed the jury on the lesser included offense of Sexual Assault in the Third Degree (Sexual Assault 3).  The ICA therefore affirmed the family court's judgment.  Malave asks this court to address the following two issues that he contends were incorrectly resolved by the ICA:

> 1.    Whether the ICA gravely erred in holding that the family court had subject matter jurisdiction pursuant to Hawai'i Revised Statutes (HRS) § 571-14(a)(1); and
>
> 2.    Whether the ICA gravely erred in finding that there was no rational basis in the record to support providing the jury instruction of the lesser included offense of sexual assault in the third degree.

We conclude that the ICA did not err in affirming the family court.  Although the jury should have been instructed to determine jurisdictional facts, the error was harmless beyond a reasonable doubt because the uncontroverted evidence showed that Malave had physical custody of CW.

---

[1]    The Honorable Shirley M. Kawamura presided.

Moreover, the family court was not obligated to instruct the jury on the lesser included offense of Sexual Assault 3 because the record did not contain a rational basis to acquit Malave of Sexual Assault 1 and convict him of Sexual Assault 3. Accordingly, we affirm the family court's judgment.

## II. BACKGROUND

On February 22, 2017, Malave was indicted on six counts in family court.[2] Counts 1-3 charged Malave with Sexual Assault in the First Degree on the Complaining Witness (CW) pursuant to Hawaiʻi Revised Statutes (HRS) § 707-730(1)(b) (2014):

> COUNT 1: On or about September 30, 2011 to and including September 19, 2013, in the City and County of Honolulu, State of Hawaiʻi, ISRAEL VEGA MALAVE, being the parent or guardian or any other person having legal or physical custody of [CW], did knowingly engage in sexual penetration with [CW], who was less than fourteen years old, by inserting his penis into her genital opening, thereby committing the offense of Sexual Assault in the First Degree, in violation of Section 707-730(1)(b) of the Hawaiʻi Revised Statutes.
>
> COUNT 2: On or about September 30, 2011 to and including September 19, 2013, in the City and County of Honolulu, State of Hawaiʻi, ISRAEL VEGA MALAVE, being the parent or guardian or any other person having legal or physical custody of [CW], did knowingly engage in sexual penetration with [CW], who was less than fourteen years old, by inserting his penis into her mouth, thereby committing the offense of Sexual Assault in the First Degree, in violation of Section 707-730(1)(b) of the Hawaiʻi Revised Statutes.
>
> COUNT 3: On or about September 30, 2011 to and including September 19, 2013, in the City and County of Honolulu, State of Hawaiʻi, ISRAEL VEGA MALAVE, being the parent or

---

[2] The indictment is captioned "IN THE FAMILY COURT OF THE FIRST CIRCUIT" and has the family court case number FC-CR No. 1FFC-17-0000115.

guardian or any other person having legal or physical custody of [CW], did knowingly engage in sexual penetration with [CW], who was less than fourteen years old, by inserting his finger into her genital opening, thereby committing the offense of Sexual Assault in the First Degree, in violation of Section 707-730(1)(b) of the Hawai'i Revised Statutes.

Counts 4-6 charged Malave with Sexual Assault in the Third Degree pursuant to HRS § 707-732(1)(b)(2014):

COUNT 4: On or about September 30, 2008 to and including September 19, 2013, in the City and County of Honolulu, State of Hawai'i, ISRAEL VEGA MALAVE, being the parent or guardian or any other person having legal or physical custody of [CW], who was not married to [CW],[3] and knew he was not married to [CW], did knowingly subject to sexual contact, [CW], a person who was less than fourteen years old, by placing his hand on her breast thereby committing the offense of Sexual Assault in the Third Degree, in violation of Section 707-732(1)(b) of the Hawai'i Revised Statutes.

COUNT 5: On or about September 30, 2008 to and including September 19, 2013, in the City and County of Honolulu, State of Hawai'i, ISRAEL VEGA MALAVE, being the parent or guardian or any other person having legal or physical custody of [CW], who was not married to [CW], and knew he was not married to [CW], did knowingly subject to sexual contact, [CW], a person who was less than fourteen years old, by placing his hand on her buttock thereby committing the offense of Sexual Assault in the Third Degree, in violation of Section 707-732(1)(b) of the Hawai'i Revised Statutes.

COUNT 6: On or about September 30, 2008 to and including September 19, 2013, in the City and County of Honolulu, State of Hawai'i, ISRAEL VEGA MALAVE, being the parent or guardian or any other person having legal or physical custody of [CW], who was not married to [CW], and knew he was not married to [CW], did knowingly subject to sexual contact, [CW], a person who was less than fourteen years old or did cause CW to have sexual contact with him, by placing her hand on his penis thereby committing the offense of Sexual Assault in the Third Degree, in violation

---

[3]     In 2016, the Hawai'i Legislature amended the definition of "sexual contact" to remove the exemption for married persons. Sess. L. 2016, ch. 231 § 32 (effective Jul. 1, 2016). HRS § 1-3 indicates that this change would only apply prospectively, so at the time of the alleged conduct, the exemption for married persons applied.

of Section 707-732(1)(b) of the Hawai'i Revised Statutes.

## A.    Relevant Trial Testimony

It was undisputed that Malave and CW began living together, along with CW's mother, when CW was five years old. It was further undisputed that on September 20, 2013, when she was eleven years old and in sixth grade, CW told her school counselor that Malave had been touching her inappropriately. The last instance of alleged assault was two days prior to CW reporting this information to her counselor.  According to CW's testimony, she had been in trouble for drinking alcohol at school on the day she made the report.

CW's school counselor testified that, when CW reported sexual abuse to her, she immediately reported this information to her administrator and called the police.  Honolulu Police Department (HPD) Officer Kalae Phillips responded to the call.

Officer Phillips testified that he interviewed CW; during the interview, CW reported sexual abuse since the age of seven, beginning with Malave undressing her and touching her in inappropriate places, and eventually leading to forced sex.

Officer Phillips further testified that Malave was arrested in the parking lot of CW's school that same day, when he arrived to pick CW up.

In her testimony at trial, CW testified that she had never been married. CW referred to Malave as her stepfather. She indicated that Malave was a strict parent at times, and that she did not think of him as her father.

With respect to Malave touching CW's breasts and buttocks, CW testified that, beginning when she was seven or eight years old, Malave "would start touching [her] on [her] boobs or [her] butt, or he would start rubbing [her] thighs." CW testified that when he touched her during this period of time, he touched her with his hands. CW testified that this happened "occasionally, sometimes two to three times a week, or whenever [her] mom wasn't home." This contact allegedly happened in CW's bedroom or Malave's bedroom. CW testified that Malave touched her both over her clothes and under them. With respect to Malave touching her breasts, CW said that she was "starting to develop" breasts at that time (when she was seven or eight). When asked to explain how Malave would touch her, CW stated that "he would rub his hands in circular motions across" her breasts or buttocks. While this happened, Malave would tell CW that he liked it, or tell her to stay still if she wanted to move. CW testified that she did not like it when Malave touched her, that she felt "gross" and "embarrassed," "didn't like [her]self," and "felt like something was wrong with [her]" that

made Malave touch her. Malave told CW that if she told anyone what was happening, he "would do the same thing to [her] little sister or hurt [her] family." CW took that threat to mean that Malave would hurt CW's mother, CW's siblings, or anyone on CW's mother's side of the family. CW believed that Malave could hurt these individuals because he was "bigger and stronger" than her. CW knew that Malave had been in the military, and that made her think Malave would "really hurt" her family.

With respect to Malave having CW touch his penis, CW next testified that, beginning when she was seven or eight years old, Malave would grab her arm and try to put her hand on his penis. Malave succeeded in putting CW's hand on his penis one time. CW testified that she did not want to touch Malave's penis and that she was "scared," "felt grossed out," and "wanted to run away." CW could not say precisely where her mother was when this happened, but testified that her mother was either at work or in her (her mother's) bedroom.[4] CW testified that Malave continued to place his hands on her breasts and buttocks until

---

[4] CW provided more details about this incident later in her testimony. She stated that this happened "before he forced [her] to have sex with him" when his pants were off but her clothes were still on. She tried to pull her arm back but Malave told her to stop. CW stopped trying to fight him and let him place her hand on his penis. He told her to be "gentle" and "careful" and had her move her hand back and forth. CW eventually stopped and Malave did not force her to continue. CW testified that she remembered nothing else from that incident.

approximately September 18, 2013, two days before she disclosed the abuse.

With respect to penetration of CW's vagina with Malave's penis, CW went on to testify that the first incident involving this type of penetration was when she was ten or eleven years old. CW testified that she was in the bathroom about to take a shower on "a late night" when her mother was not home. Malave came into the bathroom, picked her up and put her on the bathroom sink counter, and inserted his penis into her vagina. CW testified that this hurt and was uncomfortable. Afterward, she felt sick, hated herself, and wanted to run away. CW testified that there were "multiple" incidents after the first one, though she could not recall specifics of any other incident or say how many there were altogether.

For these later incidents, the prosecutor elicited testimony from CW that appeared to describe how contact with Malave usually went, and did not focus on particular instances. The following exchange was not limited to any particular time aside from CW's statement that sexual penetration began when she was about ten years old:

> Q: Okay. When the defendant would take you to your bedroom or to his bedroom that he shared with your mom, would he take you to the bed?
> A: Yes.
> Q: What position would you be in on the bed?
> A: I would be lying on my back.

```
Q: And what about his body?
A: He was over me.
Q: What about his arms?
A: They were both to the side of me.
Q: And what would he be doing with his hands?
A: He would be touching my boobs or my butt.[5]
Q: What about the rest of his body?
A: It was over me.
Q: And what would he be doing with his body?
A: He would – that's when he would insert his penis
inside my vagina, and that's when his body would be
moving back and forth.
```

CW testified further that "[o]ccasionally," Malave penetrated her vagina with his fingers. She stated that it felt "[u]ncomfortable." This happened either in CW's bedroom or in Malave's.

CW also testified that Malave inserted his penis into her mouth. In general, what led up to oral penetration according to CW's testimony was Malave grabbing CW by the arm and telling her to open her mouth and be careful. CW testified that she was scared when this happened and felt like vomiting. Again, CW did not attach any particular time to this type of contact. CW's testimony was phrased in general terms and appeared to describe what would normally happen during her sexual interactions with Malave.

CW testified that, when Malave penetrated her vagina with his penis, "a white substance came out." CW knew that it

---

[5] Because Malave was allegedly touching CW's breasts and buttocks during penetration, this conduct could serve to establish Counts 1, 4, or 5.

was a white substance because she could "feel it, or if he would move, [she] would see it on him." Although she did not know what it was at that time, it looked like a "thick cream." She testified that Malave never wore a condom.

After sexual interactions, CW testified that Malave took her clothing and washed it while CW took a shower. She stated that she did not know why he made her give him her clothing and take a shower. At one point, the washer in her house broke, so Malave washed her clothing by hand in the sink.

Malave gave CW gifts when she was ten or eleven: a new Apple computer for Christmas, an iPad, and a rose.

CW explained that the abuse occurred one to two times per week, when CW's mother was not home, until September 20, 2013, when CW disclosed the abuse to her school counselor.

CW testified that after she told her counselor what was happening, she was placed into foster care, where she spent approximately one-and-a-half weeks. She further testified that she now lives on the mainland with her grandparents who are her legal guardians.

CW also testified in an interview conducted by HPD Detective Vince Legaspi. Detective Legaspi spoke with CW on September 21, 2013. On cross-examination, defense counsel had CW confirm that she did not tell Detective Legaspi that Malave

10

"rubbed [her] boobs in a circular motion." CW stated that she told Detective Legaspi about Malave touching her breasts and buttocks, although she did not specifically describe the touching as "a circular motion." CW said that she didn't tell Detective Legaspi "most of the stuff" that she told the prosecutor's office because she was embarrassed. CW did, however, tell Detective Legaspi that Malave had forced her to have sex with him. She chose to tell him this because "that's what scared [her] the most."

Defense counsel also elicited testimony from CW in which she admitted that she did not talk about Malave touching her breasts or buttocks when she testified in front of the first grand jury in this matter on September 24, 2013. Defense counsel also pointed out that CW answered "no" when Dr. Guliz Erdem, the physician who examined CW after she reported sexual abuse, asked her whether Malave fondled her.

With respect to oral sex acts, defense counsel went on to elicit CW's testimony that she did not tell her school counselor, Officer Phillips, Detective Legaspi, or the first grand jury that Malave put his penis in CW's mouth. She did, however, say this to Dr. Erdem and in the second grand jury proceeding held in 2017.

Defense counsel also pointed out that at the first

11

grand jury proceeding, CW said that Malave took her clothes off, and at the second, she said she took her own clothes off. CW also testified that, when Malave ejaculated, the ejaculate went on to CW's bed.

Dr. Erdem testified that on September 20, 2013, she examined CW at the Sex Abuse Treatment Center. Dr. Erdem further testified that during CW's examination, CW reported that Malave: (1) penetrated her vagina with his penis; (2) put his fingers in her vagina; (3) caused oral contact between CW and Malave's genitals; (4) caused CW to masturbate him; and (5) ejaculated, but that Malave did not fondle or kiss CW. Dr. Erdem testified that CW had two "indentation cleft[s]" on her hymen - one on each side at the 9:00 and 3:00 positions (using the face of a clock for reference). The cleft at the 9:00 position was "very, very deep." Dr. Erdem said that a cleft is considered "deep" in medical terms when the cleft passes "50 percent of the lip." Dr. Erdem testified that the clefts, "especially the deep one," could be consistent with a sexual trauma - "any object penetrating the hymen opening," including a penis, finger, or other object.

Scott Henderson, criminalist at HPD's forensic biology lab, was qualified at trial as an expert in serology and forensic DNA testing. Henderson performed tests to detect semen

12

on vaginal swabs taken from CW on September 20, 2013.  He found no evidence of semen on the swabs.  He also tested a bed sheet that CW took from her bed in November 2013 and gave to her grandmother.  Henderson testified that he found no evidence of semen on the sheet.  Finally, Henderson explained that he tested CW's vaginal swabs for Malave's DNA and found none.  He testified that there are a number of explanations for lack of semen in the vaginal canal after sex, including that there was no ejaculation, condom use, showering, swimming, douching, or menstruation.

CW's grandmother also testified at trial to several anecdotes in which CW's behavior could have suggested Malave was acting inappropriately toward her.  At a family dinner at her home, grandmother reported that CW refused to sit next to Malave.  According to grandmother's testimony, one day when Malave dropped CW off at her home for a visit, CW ran upstairs to the master bathroom and got in the shower, where she stayed for approximately 45-60 minutes.  Grandmother explained that when she checked on CW, she saw CW laying on the floor of the shower.  Grandmother further testified that Malave had a vasectomy in the spring of 2012.

Malave rested after the State's case-in-chief.

## B.    Jury Instructions

The family court instructed the jury on Counts 1 to 3 with the elements of Sexual Assault 1 and did not instruct the jury on the lesser included offense of Sexual Assault 3. The family court also did not instruct the jury as to the jurisdictional facts, specifically that it must find that Malave had legal or physical custody of CW.

## C.    Conviction and Sentencing

The jury returned a verdict on November 1, 2017, finding Malave guilty of Counts 1 and 3. The jury could not reach a unanimous decision on Counts 2 and 4 to 6. The State declined to re-try Malave on Counts 2 and 4 to 6. On March 13, 2018, Malave was sentenced to 20 years each for Counts 1 and 3, to be served concurrently.

## D.    Post-Trial Procedure

Malave filed a motion to set aside judgment. The basis was that the family court lacked jurisdiction because it did not make an on-the-record finding that Malave had physical or legal custody over CW. The family court scheduled a hearing on the motion to dismiss for May 11, 2018, but Malave filed his notice of appeal to the ICA on April 13, 2018 and then withdrew the motion to dismiss on May 10, 2018.

The ICA affirmed Malave's conviction, concluding that

the family court had jurisdiction, and that Malave was not entitled to a lesser included offense instruction for Counts 1 and 3.

**E.    Supreme Court Proceedings**

Malave timely filed an application for certiorari with this court raising the following two questions:

> 1. Whether the ICA committed grave error when it found that the family court had subject matter jurisdiction pursuant to HRS § 571-14(a)(1), despite the uncontroverted evidence that Petitioner was not the legal parent, guardian, and/or having physical custody of the Minor Complainant.
>
> 2. Whether the ICA committed grave error when it found that there was no rational basis on the record to support providing the jury instruction of the lesser included offense of sexual assault in the third degree.

## III.    STANDARDS OF REVIEW

**A.    Jurisdiction**

"[A] court's jurisdiction to consider matters brought before it is a question of law which is subject to de novo review on appeal applying the 'right/wrong' standard." State v. Lorenzo, 77 Hawai'i 219, 220, 883 P.2d 641, 642 (Ct. App. 1994) (citations omitted).

**B.    Jury Instructions**

We clarified the standard of review for jury instructions that were not objected to at trial was clarified in State v. Nichols, holding that:

15

> although as a general matter forfeited assignments of error are to be reviewed under [Hawai'i Rules of Penal Procedure (HRPP)] Rule 52(b) plain error standard of review, in the case of erroneous jury instructions, that standard of review is effectively merged with the HRPP Rule 52(a) harmless error standard of review because it is the duty of the trial court to properly instruct the jury. As a result, once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.*, that the erroneous jury instruction was not harmless beyond a reasonable doubt.

Id. at 337, 141 P.3d at 984 (footnote omitted).

In the context of lesser included offense jury instructions, "this court has held that when jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." State v. Flores, 131 Hawai'i 43, 57-58, 314 P.3d 120, 134-35 (2013) (citations, alterations, and quotation marks omitted).

## IV. DISCUSSION

We conclude that the family court had jurisdiction to preside over Malave's trial, and he was not entitled to a lesser included offense instruction on Counts 1-3.

### A. Jurisdiction

#### 1. Factual Determinations Regarding the Family Court's Jurisdiction Over the Case Should Have Been Submitted to the Jury

Hawaii's family court is a division of the circuit

16

courts.  Adams v. State, 103 Hawai'i 214, 222, 81 P.3d 394, 402 (2003) (citing HRS § 571-3 (1993)).  HRS § 571-14(a) (2018) gives the family court exclusive original jurisdiction "[t]o try any offense committed against a child by the child's parent or guardian or by any other person having the child's legal or physical custody."[6]

"In the first circuit any judge or judges so designated by the chief justice of the supreme court shall be the judge or judges of the family court of the first circuit." HRS § 571-4 (2018).  In 1996, an order was entered by Chief

---

[6]     The full text of subsections (1) and (2) - the subsections relevant here - is as follows:

Except as provided in sections 603-21.5 and 604-8, the court shall have exclusive original jurisdiction:

(1) To try any offense committed against a child by the child's parent or guardian or by any other person having the child's legal or physical custody, and any violation of section 707-726, 707-727, 709-902, 709-903, 709-903.5, 709-904, 709-905, 709-906, or 302A-1135, whether or not included in other provisions of this paragraph or paragraph (2);

(2) To try any adult charged with:

(A) Deserting, abandoning, or failing to provide support for any person in violation of law;

(B) An offense, other than a felony, against the person of the defendant's husband or wife;

(C) Any violation of an order issued pursuant to chapter 586; or

(D) Any violation of an order issued by a family court judge.

17

Justice Ronald Moon designating circuit judges of the first circuit to sit as family court judges. Order Designating Circuit Judges of the First Judicial Circuit of the State of Hawai'i to Act as Circuit Family Judges, Hawai'i Supreme Court (Oct. 29, 1996), https://www.courts.state.hi.us/docs/sct_various_orders/order19.pdf. Thus, when first circuit court judges preside over criminal cases in family court, it is immaterial whether or not the family court has jurisdiction under HRS § 571-14(a), circuit court judges sitting in family court have authority over both circuit and family matters.[7] Adams, 103 Hawai'i at 222, 81 P.3d at 402.

Pursuant to HRS § 701-114(1)(c)(2014), however, "no person may be convicted of an offense unless" the State proves "[f]acts establishing jurisdiction" beyond a reasonable doubt. As noted above, the family court has jurisdiction to try offenses allegedly committed against children by any person having legal or physical custody of the child. HRS § 571-14(a)(1). The family court thus should have instructed the jury

---

[7]   District court and family court judges in the first, second, third, and fifth circuits are also temporarily assigned to preside in the circuit courts pursuant to a separate 1996 order from Chief Justice Moon. Assignment of District and District Family Court Judges, Hawai'i Supreme Court (Oct. 29, 1996), https://www.courts.state.hi.us/docs/sct_various_orders/order19a.pdf.

that it must find beyond a reasonable doubt that Malave satisfied these criteria.[8] State v. Iuli, 101 Hawai'i 196, 207, 65 P.3d 143, 154 (2003).

We conclude that when a jury trial is conducted in family court in a case subject to HRS § 571-14(a), the jury should be instructed by way of a special interrogatory to find whether the defendant had physical or legal custody of the complaining witness.  Because many family court judges are also circuit court judges, pursuant to Adams, lack of physical or legal custody alone may not justify an acquittal.  If the jury finds that the defendant did not have physical or legal custody of the CW, and the presiding judge is both a family court judge and a circuit court judge, the judge has jurisdiction in the capacity of a circuit court judge.[9]

## 2.  Failure to Instruct the Jury on Jurisdiction Was Harmless

"[W]here uncontradicted and undisputed evidence of . . . jurisdiction . . . is contained in the record, the trial court's failure to instruct the jury is harmless beyond a

---

[8]   Iuli thus implicitly overruled the holding in State v. Alagao, 77 Hawai'i 260, 262, 883 P.2d 682, 684 (App. 1994), that "the court, not the jury, decides the facts relevant to the question of subject matter jurisdiction."

[9]   We also note that while HRS § 571-14 allows the family court "exclusive original jurisdiction" over certain cases, it also allows waiver of that jurisdiction.

reasonable doubt." Id. Malave's application incorrectly states that there was "uncontroverted" evidence that Malave did not have legal or physical custody of CW at the time of the offenses. While it is clear that Malave did not have legal custody of CW, he has not presented any argument, or pointed to any evidence, showing that he did not have physical custody of CW.

"'Physical custody' means the physical care and supervision of a child."[10] HRS § 583A-102. The evidence in the record instead shows that Malave did have physical custody of CW for the reasons the ICA noted: CW lived with her mother, Malave, and CW's two half-siblings; Malave watched and cared for CW while her mother was at work; Malave cooked meals, did laundry, disciplined CW, and sometimes helped her with homework; and CW was expected to follow Malave's rules and obey him. Failure to instruct the jury on jurisdiction was thus harmless beyond a reasonable doubt.

## B. Lesser Included Offense Instruction

### 1. Third-Degree Sexual Assault is a Lesser Included Offense of First-Degree Sexual Assault

The definitions of Sexual Assault 3 and Sexual Assault

---

[10] Alagao, 77 Hawai'i at 263, 883 P.2d at 685, relied on a statutory definition of "physical custody" that the legislature amended in 2002. 2002 Haw. Sess. Laws Act 124. We thus no longer rely on the definition as stated in Alagao.

1 are identical save for one term - where Sexual Assault 1 uses the term "sexual penetration," Sexual Assault 3 uses the term "sexual contact."  At the time of Malave's offense, "sexual contact" was defined as:

> [A]ny touching, other than acts of 'sexual penetration', of the sexual or other intimate parts <u>of a person not married to the actor</u>, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.

HRS § 707-700 (1972) (emphasis added).

> "Sexual penetration" was (and is) defined as:

> (1) Vaginal intercourse, anal intercourse, fellatio, deviate sexual intercourse, or any intrusion of any part of a person's body or of any object into the genital or anal opening of another person's body; it occurs upon any penetration, however slight, but emission is not required. As used in this definition, 'genital opening' includes the anterior surface of the vulva or labia majora; or

> (2) Cunnilingus or anilingus, whether or not actual penetration has occurred.

HRS § 707-700.

Our initial analysis is whether the presence of the exemption for married persons in the definition of "sexual contact" excluded Sexual Assault 3 from being a lesser included offense of Sexual Assault 1.  We conclude that it did not.

The definition of a lesser included offense is set forth in HRS § 701-109(4):

> (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or

(c) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

At the time, Sexual Assault 3 required that the perpetrator was not married to the victim.  Therefore, it appears initially that Sexual Assault 3 is not an included offense in Sexual Assault 1 pursuant to (4)(a) because it requires proof of an additional fact - that the perpetrator and victim were not married.  This court laid out the elements of first-degree and third-degree sexual assault in State v. Arceo, 84 Hawai'i 1, 14-15, 928 P.2d 843, 856-57 (1996).  In Arceo, we recognized that third-degree sexual assault required proof of an element that first-degree sexual assault did not, namely that the perpetrator "was aware that the Minor was not married to him."  Id. at 15, 928 P.2d at 857.  But the Arceo court was not asked to decide whether the additional element excluded Sexual Assault 3 from being included in Sexual Assault 1.

Cases from this court and the ICA have assumed that Sexual Assault 3 is a lesser included offense of Sexual Assault 1.  See, e.g., State v. Behrendt, 124 Hawai'i 90, 108, 237 P.3d 1156, 1174 (2010) (affirming the circuit court's decision to

instruct the jury on Sexual Assault 3 as a lesser included offense of Sexual Assault 1); State v. Mueller, 102 Hawai'i 391, 397-98, 76 P.3d 943, 949-50 (2003) (vacating conviction of Sexual Assault 1 and remanding to the circuit court with instructions to enter a judgment of conviction of the lesser included offense of Sexual Assault 3) (superseded on other grounds by statute as stated in Behrendt); State v. Abdon, No. CAAP-13-86, 2014 WL 4800994, at *6 (App. Sep. 26, 2014) (vacating the circuit court's judgment based on its failure to instruct on the lesser included offense of Sexual Assault 3 for the charge of Sexual Assault 1) (citing Behrendt, 124 Hawai'i at 109-10, 237 P.3d at 1175-76); State v. Miller, No. 27065, 2007 WL 318166, at *1 (Haw. Ct. App. Jan. 30, 2007) (noting, though neither affirming nor reversing, that the circuit court vacated the jury's guilty verdict on the first-degree sexual assault charge and entered judgment on the lesser included offense of third-degree sexual assault).[11] None of these cases discuss the significance of the fact that "sexual contact" included the requirement that the perpetrator and victim were not married, which appears to exclude Sexual Assault 3 from inclusion in Sexual Assault 1 pursuant to HRS § 701-109(4)(a).

---

[11] All of these cases were decided before the Legislature removed the exemption for married couples from the definition of "sexual contact."

The most logical and simplest resolution of this apparent conflict lies in HRS § 701-109(4)(c), which defines a lesser included offense to be one which "differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person." Sexual contact - short of penetration - carries a less serious injury or risk of injury to the victim. This reconciles the additional element that Sexual Assault 3 contained at the time of Malave's alleged offenses with the proposition that it is a lesser included offense of Sexual Assault 1.

The case law on included offenses under HRS § 701-109(4)(c) explains that the subsection applies where "there may be some dissimilarity in the facts necessary to prove the lesser offense, but the end result is the same." State v. Kinnane, 79 Hawai'i 46, 55, 897 P.2d 973, 982 (1995) (citations omitted). This court applies the following factors to determine whether an offense is included pursuant to subsection (c): "(1) the degree of culpability; (2) the degree or risk of injury; and (3) the end result." Id.

In State v. Kinnane, we found that sexual assault in the fourth degree was an included offense in attempted sexual

24

assault in the second degree[12] pursuant to HRS § 701-109(4)(c).
Id. at 56, 897 P.2d at 983. Much of the reasoning of Kinnane is
helpful here.[13]

In analyzing the second factor, injury or risk of
injury, the Kinnane decision states that "'sexual contact' (i.e.
'any touching of the sexual or other intimate parts of a
person,') . . . is 'less serious' than the risk of 'sexual
penetration' (i.e. any intrusion of any part of a person's
body . . . into the genital . . . opening of another person's
body.)" Id. (second and third ellipses in original). In

---

[12]The court wrote:

> A person commits the offense of attempted sexual
> assault in the second degree . . . if the person
> intentionally engages in conduct which, under the
> circumstances as the person believes them to be,
> constitutes a substantial step in a course of conduct
> intended or known to be practically certain to
> subject another person to an act of sexual
> penetration that the person is aware is by
> compulsion.
>
> . . . .
>
> A person commits the offense of sexual assault in the
> fourth degree . . . if the person knowingly subjects
> another person to sexual contact by compulsion or
> causes another person to have sexual contact with the
> actor by compulsion.

79 Hawai'i at 53-54, 897 P.2d at 980-81.

[13]    For the first factor, the Kinnane court found that the requisite state
of mind of attempted second-degree sexual assault is a combination of
knowledge and intent, while the requisite state of mind of fourth-degree
sexual assault is knowledge. Id. at 55, 897 P.2d at 982. This does not apply
to Malave's case because the requisite state of mind for both first- and
third-degree sexual assault is knowledge. HRS §§ 707-730(1)(b), 707-
732(1)(b).

25

Kinnane, therefore, it was immaterial that the two offenses at issue - attempted sexual assault in the second degree and sexual assault in the fourth degree - did not require proof of any injury as an element of the offense.  The sexual contact or sexual penetration itself could also be viewed as the injury in Malave's case.  See State v. Buch, 83 Hawai'i 308, 313, 926 P.2d 599, 604 (1996) (noting that, where two offenses both require some type of sexual contact to establish their commission, the two offenses "require proof of the same injury").

Finally, the Kinnane court found that the third factor, the end result of each offense, weighed in favor of finding that Sexual Assault 4 was a lesser included offense of attempted Sexual Assault 2.  79 Hawai'i at 56, 897 P.2d at 983. "In both instances the victim . . . is placed in jeopardy of being injured or is being injured by the defendant's conduct." Id. (quoting State v. Feliciano, 62 Haw. 637, 639, 618 P.2d 306, 308 (1980) (ellipsis in original) (brackets in original omitted)).

Based on Kinnane, we conclude that Sexual Assault 3 is an included offense of Sexual Assault 1 pursuant to HRS § 701-109(4)(c).

2. **There Was No Rational Basis for the Jury to Acquit Malave of First-Degree Sexual Assault But Convict Him of Third-Degree Sexual Assault**

26

Although Sexual Assault 3 is a lesser included offense of Sexual Assault 1, the family court was not required to instruct the jury on it. As noted above, "[A] 'trial court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him of the included offense.'" State v. Flores, 131 Hawai'i 43, 50, 314 P.3d 120, 127 (2013) (quoting State v. Kupau, 76 Hawai'i 387, 390, 879 P.2d 492, 495 (1994)).

Malave points to four pieces of evidence that he argues contradict or call into question CW's testimony: (1) CW's statement to her school counselor that Malave had been "touching her inappropriately"; (2) CW's statement to Officer Phillips that Malave had forced her to have sex with him, without specifically defining "sex" as penetration; (3) CW's statement on cross-examination that it was "possible" that Malave had only touched her inappropriately;[14] and (4) what Malave called Dr. Erdem's "leading questions" during CW's examination at the Sex Abuse Treatment Center.

---

[14]   This argument misstates the trial testimony. During cross-examination, CW said that she did not remember exactly what she told the counselor on September 20, 2013, and that it was possible that she had told the counselor only that Malave was touching her inappropriately. CW did not say that it was possible that Malave never penetrated her, which is what the certiorari application states.

FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

But these points are unavailing.  CW's statements that Malave had been "touching" her are not evidence that Malave did not penetrate her.  Similarly, CW's failure to provide a definition of "sex" does not support the contention that there was no penetration.  CW never stated that it was possible that Malave never penetrated her.  And Dr. Erdem's questions were not unduly leading, nor would leading questions tend to show that Malave did not penetrate CW.

Thus, after reviewing the record, we find that there was no rational basis in the evidence for a jury to acquit Malave of Sexual Assault 1 but convict him of Sexual Assault 3 for the conduct underlying the Sexual Assault 1 charges.  As stated above, the alleged acts underlying the Sexual Assault 1 charges were: (1) inserting his penis into CW's genital opening; (2) inserting his penis into CW's mouth; and (3) inserting his finger into CW's genital opening.  In order to provide a rational basis to instruct the jury on Sexual Assault 3 for these counts, there must be some evidence presented that Malave merely made contact between his penis and CW's genitals or mouth, or between his finger and CW's genitals, that did not rise to penetration.[15]

---

[15]    The ICA seemed to conclude that Malave's decision not to testify

Given the lack of evidence to establish that only sexual contact, and not sexual penetration, occurred for the type of conduct alleged in Counts 1 to 3, there was no rational basis for a jury to acquit Malave of Sexual Assault 1 while convicting him of Sexual Assault 3 for this alleged conduct.

Several ICA decisions on the subject of lesser included offense instructions rely on this court's opinion in Behrendt, 124 Hawai'i 90, 237 P.3d 1156. We thus take this opportunity to clarify that prior decision. In Behrendt, the trial court instructed the jury on the lesser included offense of Sexual Assault 3. 124 Hawai'i at 108, 237 P.3d at 1174. The jury acquitted the defendant of Sexual Assault 1, but convicted him of Sexual Assault 3. Id. at 100, 237 P.3d at 1166. On appeal, the defendant challenged the trial court's decision to instruct on the lesser charge. Id. at 108, 237 P.3d at 1174. This court affirmed the circuit court based on our conclusion that there was a rational basis to instruct the jury on the lesser charge, even though the evidence presented largely focused on penetration, reasoning that "a rational juror could

---

precluded satisfying the rational basis standard for the lesser included offense instruction. This proposition is incorrect, as a defendant may not be penalized for exercising the right not to testify. Chavez v. Martinez, 538 U.S. 760, 768-69 (2003). Rather, there must be some evidence in the record that provides a rational basis to acquit of the greater offense and convict of the lesser, regardless of who presents that evidence and how.

have inferred that there was 'sexual contact' <u>prior to the penetration</u>."  124 Hawai'i at 110, 237 P.3d at 1176 (emphasis added).

ICA decisions holding that defendants were entitled to lesser included offense instructions for Sexual Assault 3 when charged with Sexual Assault 1 appear generally to treat Sexual Assault 1 as categorically requiring a lesser included offense instruction.  <u>See</u> <u>State v. Wright</u>, 144 Hawai'i 381, 442 P.3d 444, 2019 WL 2148065, at *3 (unpublished) (App. May 16, 2019) ("[W]hen a complaining witness testifies that a defendant has committed an act of 'sexual penetration,' the trial court must also instruct the jury on the lesser included offense as it is a rational inference that 'sexual contact' also occurred."); <u>State v. Abdon</u>, 2014 WL 4800994, at *7.  As shown by our analysis in the instant case, this interpretation of <u>Behrendt</u> is not correct.  The evidence in <u>Behrendt</u>, which this court explained in detail in the opinion, included evidence from which a jury could rationally conclude that the defendant committed Sexual Assault 3, but not Sexual Assault 1, during the conduct that the State alleged constituted Sexual Assault 1.  For example, in <u>Behrendt</u>, CW testified that the defendant "would have me sit on top of him, where he's behind me, or he would have me straddle him."  This conduct could constitute Sexual Assault 3, but

30

because it does not speak of penetration, would not be sufficient to constitute Sexual Assault 1. There was no similar evidence present in the record of Malave's case. We thus emphasize that, while evidence of Sexual Assault 1 may often support giving the lesser included offense instruction of Sexual Assault 3, this is a fact-specific inquiry rather than a categorical rule. And in Malave's case, the record did not support giving the lesser included offense instruction.

## V. CONCLUSION

For the reasons above, we affirm the family court's March 13, 2018 judgment of conviction and sentence and the ICA's July 1, 2019 judgment on appeal.

Emmanuel G. Guerrero
For petitioner

Sonja P. McCullen
For respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

